In the Interest of D.S., Minor Child,

D.S., Father, Appellant,

J.M., Mother, Appellant.

No. 11–0954.

Court of Appeals of Iowa.

Oct. 5, 2011.

Steven J. Drahozal of Drahozal Law Office, P.C., Dubuque, for appellant father.

Jodee R. Dietzenbach of the Law Offices of Thad J. Murphy, P.C., Dubuque, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine Miller–Todd, Attorney General, Ralph Potter, County Attorney, and Jean Becker, Assistant County Attorney, for appellee State.

MaryBeth Fleming, Dubuque, for intervenors.

Mary Kelley, Dubuque, for minor child.

Considered by VOGEL, P.J., and POTTERFIELD and DANILSON, JJ.

DANILSON, J.

A father and mother appeal from the order terminating their parental rights to their one-year-old son. They contend the juvenile court erred in terminating parental rights without the testimony of a qualified expert witness and that the State failed to prove active efforts were made for reunification. The father also contends the juvenile court erred in failing to address placement until after the termination hearing. The mother also contends termination is not in the child's best interests. Considering the parents' lack of involvement with the child and their periods of incarceration during these proceedings, we find termination of parental rights in the best interests of the child. The parents are also unable to safely parent the child and provide for his extensive medical needs. The child's permanency cannot be further delayed. The Iowa Indian Child Welfare Act (ICWA) requirements under Iowa Code chapter 232B are satisfied in this case. For these reasons, we affirm the decision of the juvenile court.

## I. Background Facts and Proceedings.

This family came to the attention of the Iowa Department of Human Services (DHS) shortly after the child's birth on January 15, 2010. He was born prematurely and with severe medical issues.[1] Shortly after his birth, he was transferred from Finley Hospital in Dubuque to the University of Iowa Hospitals in Iowa City. Medical staff was unable to make contact with the parents and the parents did not call to check on the child. The mother later admitted that she received no prenatal care, and smoked cigarettes and consumed alcohol throughout the pregnancy.

On January 21, 2010, the child was transferred back to Finley Hospital in Dubuque. On January 23, 2010, the parents visited the child for fifteen minutes. The mother was offered transportation and a room at Finley Hospital because she was unemployed and lived approximately fourteen blocks from the hospital, but she declined. The child was transferred back to University of Iowa Hospitals due to additional health concerns. Again, the mother was offered transportation, lodging, and food to stay in Iowa City with the child, which she declined. Medical providers were not able to contact the parents to receive consent for treatment for the child.

On January 25, 2010, the juvenile court entered an ex parte removal order due to concerns about abandonment by the parents. The child was placed in the custody of DHS, for appropriate foster care placement once discharged from the hospital.

The mother is a member of the Ho–Chunk Nation Indian tribe. The tribe was notified immediately upon the entry of the emergency removal order. The tribe subsequently filed a motion to intervene, which was granted by the court.

---

1. D.S. was born at thirty-five weeks of gestation with severe respiratory distress. He developed congestive heart failure, breathing problems, allergies, inflammation, and hypertension. His care required, among other things, surgeries, nebulizer treatments, blood pressure checks, medication, strict food regimen, x-rays, and hospitalizations.

A removal hearing was held on February 3, 2010. The mother did not appear. The father appeared and objected to the continued removal of the child. The father had previously served time in prison for burglary and armed robbery. He testified he had raised another child, had completed parenting classes in prison, and was prepared to take custody of the child. Tribal counsel appeared and opined that custody of the child should remain with DHS for foster family placement upon the child's release from the hospital. A foster family had been identified and the foster parents had visited the child a number of times in the hospital. The foster mother, a pediatric nurse, was aware of the child's health concerns.

The child was adjudicated in need of assistance on March 29, 2010, following an adjudication/disposition hearing. Tribal counsel appeared at the hearing, as well as the mother and father, both represented by counsel. The court found the parents had become more cooperative with services but continued to lack a full understanding of the child's significant health issues and needs. The court observed that DHS had been in continuous contact with the tribe regarding placement options and services and active efforts were being made to provide remedial and rehabilitative services designed to prevent the breakup of the Indian family but these efforts had not been successful due to the parents' slow progress. Stephanie Lozano, a social worker and qualified expert witness for the tribe, testified at the hearing. Lozano opined that custody of the child by the parents or Indian custodian would likely result in serious emotional or physical damage to the child and the current foster family placement was appropriate, particularly due to the child's medical needs. Placement of the child was continued with the foster family, with a goal of family reunification.

Following a June 25, 2010 review hearing, the court observed the mother was beginning to engage in services. She had become more involved with the child and was attending his doctor appointments. Visitation became partially supervised, and the mother began to display she could meet the child's basic needs. However, there continued to be concerns about the mother's commitment to the father, due to his continued drug use and incarceration. The father tested positive for THC in March and April and became incarcerated in Illinois in May as a result of a probation violation.

Unfortunately, the mother's status began deteriorating by the permanency hearing on September 25, 2010. The court observed the mother was incarcerated in Wisconsin and facing a two-year sentence. DHS noted that in July 2010, the mother was intoxicated when the child arrived for a visit, and the visit was cancelled. DHS later learned the mother had been arrested in Wisconsin in August 2010, where she had five prior operating-while-intoxicated convictions and was wanted for probation violations. The father was still incarcerated, but his counsel indicated he had an anticipated release date in November 2010. The court observed that the child continued to have medical needs, but was thriving in the care of the foster family. The foster family indicated they would be willing to adopt the child. Tribal counsel stated the tribe would only support termination of parental rights if the child was placed in an Indian home. DHS located such a home in Wisconsin, where a cousin of the child had also been placed. The court ordered DHS to conduct a home study on the home in Wisconsin.

At the permanency hearing on December 16, 2010, the court observed the home study was currently being conducted in

Wisconsin. The mother remained incarcerated, but the court noted she intended to move to Wisconsin once released from prison. The father also intended to move to Wisconsin in the near future. The court ordered DHS to receive the home study, review it with the parents, and if feasible, begin a slow transition of the child to Wisconsin. Due to the child's need for permanency, the court also directed the State to initiate termination of parental rights, which would also be addressed at the next hearing, scheduled for February 17, 2011.

The court reset the February hearing for March 23, 2011, granting the parents' motions for extension of time despite a "serious concern that an extension of time would not be in the best interests of the child." The court advised that the scope of the hearing would pertain only to the State's petition for termination of parental rights, the grounds alleged therein, and the evidence required pursuant to Iowa Code section 232B.6(6)(a) (2009) of the Indian Child Welfare Act.

On February 24, 2011, the tribe filed a motion for placement in accordance with ICWA. In the motion, the tribe stated its preference that the child be placed with the proposed foster family in Wisconsin. The tribe stated such placement "would allow D.S. to be placed with one of his Ho–Chuck relatives" and "would permit the mother and father to continue to have reasonable contact with the child in the future." The tribe further stated the Wisconsin foster family had recently been approved by the Wisconsin Interstate Compact for the Placement of Children and the approval paperwork had been mailed to Iowa.

On March 10, 2011, the child's Iowa foster parents filed a motion to intervene.

The motion detailed the child's extensive medical needs, expressed concern the Wisconsin foster family was "not familiar with his medical needs," and opined placement of D.S. with the Wisconsin foster family "could potentially have dire and far-reaching effects for D.S. and ... could cause him severe physical and psychological harm."

The termination hearing was held over two days, on March 23 and April 14, 2011. The mother had been released from prison on March 15, 2011, and participated in the hearing. The father appeared as well. The State, guardian ad litem, and DHS caseworkers supported termination of the father's and mother's parental rights. The tribe disagreed. Lozano, the tribe's social worker, opined: (1) termination was not something that the tribe viewed as culturally appropriate; (2) the parents should have additional time (in terms of years) for reunification; (3) active efforts had not been made to the parents, and (4) the child should be placed in the Indian home in Wisconsin, as requested by the tribe.

The juvenile court granted termination of the father's and mother's parental rights pursuant to Iowa Code sections 232.116(1)(h) and 232B.6(6)(a). Specifically in respect to the ICWA provision set forth in section 232B.6(6)(a), the court determined (1) Lozano was a qualified expert witness whose testimony indicated the parents could not care for the child and (2) the evidence supported a finding beyond a reasonable doubt the child would suffer serious physical or emotional damage if he were to be returned to the custody of the parents. The court did not address the child's placement, other than noting the child was currently in a foster-adopt home and he could not be returned to the custody of the parents. The father and mother

now appeal.[2]

## II. Scope and Standards of Review.

 We conduct a de novo review of termination of parental rights proceedings. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). Although we are not bound by the juvenile court's findings of fact, we do give them weight, especially in assessing the credibility of witnesses. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is considered "clear and convincing" when there are no "serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.* However, termination of the parental rights of an Indian child shall not be ordered unless supported by evidence beyond a reasonable doubt that "the continued custody of the child by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Iowa Code § 232B.6(6)(a). The evidence must also include the testimony of a qualified expert witness as defined in section 232B.10. *See* Iowa Code § 232B.6(6)(a). To the extent the parents' claims of error rest upon statutory interpretation, our review is for correction of errors of law. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct.App.2010). The paramount concern in termination proceedings is the best interests of the child. *See In re P.L.*, 778 N.W.2d at 39 (holding best interests are to be determined within statutory framework and not upon court's own perceptions).

## III. Analysis.

 Iowa Code chapter 232 termination of parental rights follows a three-step analysis. *See P.L.*, 778 N.W.2d at 39. The court must initially determine whether a ground for termination under section 232.116(1) is established. *Id.* If a ground for termination is established, the court must next apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights. *Id.* If the statutory best-interest framework supports termination of parental rights, the court must finally consider if any statutory exceptions or factors set out in section 232.116(3) weigh against termination of parental rights. *Id.*

 In addition to this analysis, Iowa Code chapter 232B sets forth Iowa's Indian Child Welfare Act (ICWA), which extends further protections to Indian families and tribes. *See* Iowa Code chapter 232B; *In re J.L.*, 779 N.W.2d 481, 485 (Iowa Ct.App.2009). The ICWA has a dual purpose—to protect the best interests of a child and preserve the Indian culture. *J.L.*, 779 N.W.2d at 492. The ICWA must be applied, even where there is no evidence the child has been raised in an Indian culture. Iowa Code § 232B.5(2) ("A state court does not have discretion to determine the applicability of ... this chapter to a child custody proceeding based upon whether an Indian child is part of an existing Indian family."); *see In re R.E.K.F.*, 698 N.W.2d 147, 151 (Iowa 2005). The provisions of the ICWA are to be strictly construed. *C.A.V.*, 787 N.W.2d at 99. Even under an ICWA analysis, however, the paramount interest remains the protection of the best interests of the child. *J.L.*, 779 N.W.2d at 492.

### A. Grounds for Termination.

The parents do not dispute the grounds for termination have been proved. How-

---

**2.** Our original ruling on appeal was filed on September 8, 2011. Upon the father and mother's timely-filed petitions for rehearing, we now re-issue our ruling to further clarify several issues in this case.

ever, the parents contend the State failed to prove the "active efforts" requirement of the Iowa ICWA was satisfied.

■■■ *1. Active Efforts.* A party seeking termination of parental rights over an Indian child must provide evidence to the juvenile court that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Iowa Code § 232B.5(19). This burden must be met by clear and convincing evidence. *See C.A.V.*, 787 N.W.2d at 100. The active efforts requirement set forth in section 232B.5(19) attempts to preserve the parent-child relationship or the child's connection to Indian culture. *See id.* at 103.

The State contends this issue has not been preserved for our review. The State argues the mother has only preserved this issue with respect to placement preferences, not remedial services and rehabilitative programs. Even assuming the issue was properly preserved, we conclude active efforts were made to prevent the breakup of the Indian family.

■■■ The tribe was notified immediately when DHS became involved with the family—while D.S. was in the hospital receiving care following his birth. DHS began offering services to the parents at that time. When it became clear the parents were not cooperating or accessing services, DHS found a foster family to care for the child upon his release from the hospital. The tribe agreed with this placement and stated the foster family was appropriate to care for the child's special needs. The parents eventually began to access services and engage in visitation with the child. Unfortunately, any progress was stifled by the parents' incarceration—the father for six months and the mother for seven months—during these proceedings.

The tribe continued to agree the services and placement of the child were appropriate. The tribe alleged it noted its preference the child be placed with an Indian family in Wisconsin in August 2010. At the very next hearing in September 2010, the court ordered DHS to conduct a home study on the family. At the December 2010 hearing, the court ordered DHS to continue and complete the home study. During this time, both parents were incarcerated. The State filed a termination petition in January 2011. As of the last day of the termination hearing on April 14, 2011, the court still had not received notice of an approval on the home study.

Throughout these proceedings, the juvenile court frequently addressed the State's efforts to preserve the family and provide for reunification. The court's February 5, 2010 removal order stated in part:

> Pursuant to Iowa Code section 232B.5(19), the Court finds the Department has made active efforts to prevent the break-up of the Indian family. However, due to the age of the infant, his significant medical issues, and the mother's refusal to cooperate with services, those efforts have proven unsuccessful.

The court's March 29, 2010 CINA adjudication order stated in part:

> The Department has been in continuous contact with the Ho–Chunk Nation regarding placement options and services. As a result, the Department has provided evidence to the Court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family, but these efforts have not yet been successful due to the parents' slow progress.
>
> Due to the child's significant medical health needs and parents' slow progress,

the qualified expert testified it was her opinion that custody of the child by the child's parents or Indian custodian would likely result in serious emotional or physical damage to the child. The expert testified it was her opinion the child's current foster care placement is appropriate as the foster mother is a pediatric nurse and able to quickly identify any medical needs.

The court's July 5, 2010 review order stated in part:

> The Court finds the Department is providing active efforts to provide remedial services and prevent the break-up of the Indian family. Specifically, the mother is receiving increased interactions, parenting skills, education, and mental health treatment.

The court's September 27, 2010 permanency order stated in part:

> The Court finds that the Department was providing active efforts to provide remedial services and prevent the break-up of the Indian family up until the time of the parents' incarcerations.

The court's December 20, 2010 permanency order stated in part:

> The Court continues to find that the Department is providing active efforts to provide remedial services and prevent break-up of the Indian family. The Court finds the services are sufficient and the parents are advised that a failure to identify a deficiency in services or to request additional services may preclude the parents from challenging the sufficiency of services in a termination of parental rights proceeding and the parents are further warned that the consequences of a permanent removal my include termination of parental rights to the child in interest.

Finally, the court's May 13, 2011 termination order stated on this issue:

The State and guardian ad litem supported the Department's recommendation for termination of parental rights. The tribe did not support the recommendation and complained that active efforts were not provided to the parents. The Court finds the tribe's position on this issue to be without merit for two reasons. First, Iowa appellate courts have clearly held that a party cannot wait until the time of the termination hearing to raise the issue of deficient services. The Court finds no provisions in ICWA which would exempt a tribe from this same requirement.

In the present case, the tribe was notified almost immediately after mother advised of her membership and has been involved since shortly after D.S.'s birth. The tribe was offered to assume jurisdiction and placement of the child, which they declined. The tribe has been provided with reports from the Department, case permanency plans, and all orders entered by the Court. The tribe has participated either personally or telephonically in court hearings, family team meetings and office staffing meetings. They have been kept apprised of events through phone calls and emails from the case worker. At no time during the pendency of the case did the tribe indicate that appropriate services were not being provided to the parents. On February 24, 2011, the tribe filed a motion for placement in accordance with ICWA in which it requested "a more specific plan needs to be developed for placement of the child" and that "further active efforts would include additional attempts to contact the mother's paternal family members for placement as required by ICWA." Testimony by the caseworker indicates those requests by the tribe were followed as the Department actively worked with the Native American family identified by the tribe

and the Department also contacted the mother's paternal family as requested. During the termination hearing, the following exchange took place between the guardian ad litem and tribe social worker:

Q [GUARDIAN AD LITEM]. Well, you mentioned in family team meetings and we discussed the mental health needs of the parents, the substance abuse needs, their housing needs, their financial needs, and we talked about the services that the Court has authorized the Department to provide and the Department was able to provide and recommended. Did you have any objections to the services that the Department was providing to the parents?

A [MS. LOZANO]. During the meetings, no. They sounded like they were adequate to assist the parents.

Additionally, the Court's orders ... all contained language notifying the parties that a failure to identify a deficiency in services or to request additional services would preclude the parties from challenging the sufficiency of the services in a termination of parental rights proceedings.

Second, even if the Court were to find the tribe did preserve this issue, the Court nonetheless, finds that the Department provided active efforts to the parents. When transportation was identified as an issue for the parents, the Department offered several alternatives including bus passes, taxis, and the Volunteer Nurses Association. When the mother indicated she was not comfortable riding the bus, the service provider offered to ride with her so that she could become familiar and comfortable with the routes. When the mother had difficulty getting up to attend interactions or meetings, the Department supplied her

with an alarm clock and offered to set it for her. When the parents demonstrated an inability to organize all of the appointments, contact people and required medical information for D.S., the Department put together a binder containing all the necessary information and resources. The binder also contained logs for the parents to use to document D.S.'s medical needs and food consumption. The parents were also offered substance abuse and mental health treatment, supervised visits, and parenting skills. The parents either did not follow through with the offered services or were unavailable due to their incarceration.

We conclude the ICWA active efforts requirement was met by a showing that a "vigorous and concerted level of casework beyond the level" typically constituting reasonable efforts was provided by clear and convincing evidence. *See* Iowa Code § 232B.5(19); *C.A.V.*, 787 N.W.2d at 100. The parents were provided remedial services, rehabilitative programs, supervised visits, parenting skill instruction, psychological evaluation, organizational skill training, counseling, temporary housing while the child was hospitalized, and transportation.

The mother argues active efforts were not made because DHS did not question her specifically about any paternal Native American family members. However, at the initiation of this case, DHS questioned the mother about Native American heritage, and the mother only identified her maternal relatives as being Native American. DHS contacted all family members identified by the mother to talk to them about D.S.'s needs and their ability to provide support or placement. No placement options were located. The father was also asked to provide family members who

could be located to provide family structure and support services.

The mother also contends services were not provided while she was incarcerated. Although the mother was not able to access a "more culturally appropriate alcohol treatment program" or any of the other resources that could be identified by the tribe, general services were available to the mother during her incarceration. The tribe conceded to this fact, and the tribe did not object to the services offered to the mother—but rather, stated the parents needed, and should be allowed, more time (up to five years additional time) to prove her ability to reunify with the child. "While the ICWA focuses on preserving Indian culture, it does not do so at the expense of a child's right to security and stability." *C.A.V.*, 787 N.W.2d at 104. This child cannot wait any longer for permanency. Active efforts were made to the parents.

*2. Qualified Expert Witness.* The father and mother also argue the juvenile court erred in terminating parental rights without the testimony of a qualified expert witness. We reject this contention.

██ Under section 232B.6(6)(a), a court shall not order termination of parental rights over an Indian child in the absence of a determination—including qualified expert testimony—the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. The phrase "continued custody" in this provision includes both legal and physical custody. *See C.A.V.*, 787 N.W.2d at 102. The purpose of section 232B.6(6)(a) "is to provide the juvenile court with knowledge of the social and cultural aspects of Indian life to diminish the risk of any cultural bias in the termination decision." *See In re L.N.W.*, 457 N.W.2d 17, 18 (Iowa Ct.App.

1990) (citation omitted) (discussing 25 U.S.C. § 1912(f) (1982)).

Section 232B.10 sets forth the requirements for a qualified expert witness. This section provides that a qualified expert witness may include "a social worker, sociologist, physician, psychologist, traditional tribal therapist and healer, spiritual leader, historian, or elder." Iowa Code § 232B.10(1). The qualified expert witness should have "specific knowledge of the child's Indian tribe" and should testify "regarding that tribe's family organization and child-rearing practices," and whether the tribe's "culture, customs, and laws" would support the termination of parental rights "on the grounds that continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." Iowa Code § 232B.10(2).

██ The State presented the testimony of Stephanie Lozano, a licensed social worker employed by the Ho–Chunk Nation Division of Child and Family Services. Lozano has served in that capacity since 2005 and handles cases involving ICWA for the tribe. She graduated from college with a double major in sociology and political science and was completing her master's degree in social work. Her work involved the delivery of child and family services to the tribe on a daily basis at different Ho–Chunk Nation locations across the country. At the time of the termination hearing, Lozano's caseload consisted of thirty-eight children, but "that fluctuates depending on the need." Lozano's testimony included statements regarding her work handling the services offered for each family. Lozano exhibited substantial knowledge of the prevailing social and cultural standards and child-rearing practices within the tribe.

We conclude Lozano met the requirements for a qualified expert witness in

section 232B.10. The record does not indicate the tribe formally recognized Lozano as having the knowledge to be a qualified expert, *see* section 232B.10(3)(b), but she possessed the qualifications described in sections 232B.10(3)(a) and (d).

*3. Expert Witness Testimony.* The father and mother contend the juvenile court erred because the qualified expert did not support termination of parental rights. The father and mother also argue the testimony failed to confirm "whether continued custody by the parent would result in serious emotional or physical damage to the child." The parents rely on the Kansas Supreme Court's finding in *In re M.F.*, 290 Kan. 142, 225 P.3d 1177, 1186 (2010), to support their contention that expert witness testimony must "support the ultimate decision of the juvenile court" as to whether continued custody by the parent would result in harm to the child. However, the facts in *In re M.F.* are dissimilar to the facts in this case, because the Kansas Supreme Court concluded *none* of the witnesses qualified as an expert witness under ICWA. *Id.* at 1186. Further, the Kansas court concluded, the "expert need not opine on the ultimate issue of whether the State met its burden." *Id.*

We have commented upon ICWA's requirement that there must be "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *In re S.M.*, 508 N.W.2d 732, 734 (Iowa Ct.App.1993) (quoting 25 U.S.C. § 1912(f)); Iowa Code section 232B(6)(6)(a). We have observed that this section "requires the juvenile court to consider the testimony of a qualified expert testimony prior to the termination of the parental rights of the child's parent or Indian custodian." *Id.* This expert witness

testimony "is to provide the court with knowledge of the social and cultural aspects of Indian life to diminish the risk of any cultural bias." *See In re C.A.V.*, 787 N.W.2d at 102 (citation omitted). We acknowledge that other states, in addition to Kansas, have construed this requirement in terms of the qualified expert's testimony supporting the ultimate finding that "continued custody by the parent will result in serious emotional or physical damage to the child." *See, e.g., In re M.F.*, 225 P.3d at 1186; *Marcia V. v. State*, 201 P.3d 496, 506 (Alaska 2009); *Steven H. v. D.E.S.*, 218 Ariz. 566, 190 P.3d 180, 186 (2008); *State ex rel. S.O.S.C.F. v. Lucas*, 177 Or. App. 318, 33 P.3d 1001, 1005 (2001).

Practically speaking, we may be mincing words to distinguish the terms "consider" and "support" if the qualified expert witness is not required to express a conclusion on the ultimate question. Nevertheless, we find the legislature has set forth the proper approach in Iowa Code section 232B.10:

> In considering whether to involuntarily place an Indian child in foster care or to terminate the parental rights of the parent of an Indian child, the court shall require that qualified expert witnesses with specific knowledge of the child's Indian tribe testify regarding that tribe's family organization and child-rearing practices, and regarding whether the tribe's culture, customs, and laws would support the placement of the child in foster care or the termination of parental rights on the grounds that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Iowa Code § 232B.10(2).

This section does not mandate that the qualified expert witness testify in support of termination, or in support of the

ground that custody by the parent is likely to result in serious emotional or physical harm to the child. There is also no man-. date that the tribe or the qualified expert witness recommend or consent to termination, or agree that the child would likely be subject to serious emotional or physical harm if returned home. Rather, this section instructs that, after being fully informed by a qualified expert witness, the court is to consider if the tribe's culture, customs, or laws would support termination on that ground. After giving due and careful consideration of the qualified expert testimony, and with knowledge of the tribe's support or lack of support, the court is then guided by section 232B.6, which permits termination only if the court determines that termination is "supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child." However, neither the tribe's customs or laws, nor the testimony of the qualified expert testimony, may dictate the best interests of the child. *See In re J.L.*, 779 N.W.2d 481, 492 (Iowa Ct.App.2009).[3]

Here, Lozano testified that she did not object to the services DHS had attempted to provide to the parents, and opined "they were adequate to assist the parents." Lozano acknowledged that culturally appropriate services or strategies were "really limited in the area," and that the parents did not have reliable transportation.[4] She testified she was involved in the case at its inception, and agreed that her suggestions for additional services (e.g., transportation assistance) were followed through by DHS. However, she observed that there was some animosity between her and DHS.

Moreover, Lozano had previously testified that the parents could not care for D.S. and custody of D.S. by the parents would likely result in serious emotional or physical damage to the child, but at the termination hearing Lozano declined to opine whether the child would suffer serious physical harm in the parents' care. Lozano testified that she believed the parents had not had sufficient time to overcome their issues, and she did not recommend termination. In Lozano's view, it takes a minimum of two years to overcome alcohol and drug abuse issues. And she further stated that as long as the parents did not abuse alcohol or drugs in the presence of the child, then such behavior would not be detrimental to the child.

As the mother points out, "Lozano's testimony indicated that the tribe's laws and customs did not support termination of parental rights." Indeed, Lozano testified that she was employed by the tribe and had handled a multitude of tribal cases involving ICWA over a period longer than five years. In that capacity, Lozano testi-

---

**3.** As we have previously observed:

Moreover, in no part does the Iowa ICWA suggest children's rights should be eliminated in favor of a tribe's rights. The Iowa ICWA's definition of an Indian child's best interests focuses on maintaining the Indian culture. Iowa Code § 232B.3(2). However, nothing in Iowa Code chapter 232B places maintaining the Indian culture above a child's rights or safety. *See, e.g.,* Iowa Code §§ 232B.6 (providing that the chapter shall not be construed to prevent the emergency removal in order to prevent immi-

nent physical damage or harm to the child); 232B.9(2) (providing that the placement of an Indian child shall be in a setting where the child's special needs are met); 232B.9(6) (stating the placement preference of an Indian child may be considered).

*In re J.L.,* 779 N.W.2d 481, 492–93 (Iowa Ct.App.2009).

**4.** Lozano worked out of Wisconsin, and the parents lived in Dubuque, three and one-half hours away.

fied that she had only recommended termination on one occasion in a contested case.

■ Upon our review of Lozano's lengthy and detailed testimony, coupled with our consideration of the underlying purpose and intent of the ICWA, we find Lozano's testimony lends some support to the ultimate finding of the juvenile court that "the continued custody of the child by the child's parent ... is likely to result in serious emotional or physical damage to the child." Iowa Code § 232B.6(6)(a). From Lozano's testimony, the juvenile court could conclude the parents had not overcome their issues, their substance abuse issues were going to require long-term rehabilitation, active efforts had been provided to-date, and the qualified expert (Lozano) was not likely to ever support termination due to the tribe's laws and customs. In fact, the juvenile court observed that Lozano "did not support termination of parental rights as that is not something the Ho–Chunk Nation views as culturally appropriate. However, Lozano did concede that the parents would need additional time and training to care for a special needs child."

■ The paramount interest of the ICWA is the protection of the best interests of the Indian child. J.L., 779 N.W.2d at 492. Situations will arise in which the child's best interests may override tribal or family interests, and in those situations, specific preferences of the tribe or family should not be followed. See id. (detailing purpose and intent of Iowa ICWA). True, Iowa ICWA's definition of an Indian child's best interests focuses on maintaining the Indian culture. Iowa Code § 232B.3(2). However, "in no part does the Iowa ICWA suggest children's rights should be eliminated in favor of a tribe's rights." J.L., 779 N.W.2d at 492. Further, nothing in the ICWA places maintaining the Indian culture above a child's safety. Id. Here, it is clear the child would not be safe in the continued custody of the parents, and such custody would result in harm to the child. We affirm the conclusion of the juvenile court as to this issue.

■ 4. *Placement.* The father contends the juvenile court erred in failing to address placement until after the termination hearing. We disagree.

■ The child was removed from the custody of the parents in January 2010, when he was less than two weeks old. The child was placed in the care of a foster family, where he has remained since removal. The issue of placement was raised in February 2011 when the tribe requested placement with an Indian foster family in Wisconsin. At that time, termination proceedings had been initiated, and the court ordered the issue of placement to be addressed at the termination hearing. The court later ordered it would only take up the issue of termination at the hearing. After a termination hearing held over two days, the court determined the child could not be returned to the parents' care and should not be forced to wait for permanency. See, e.g., In re A.C., 415 N.W.2d 609, 613 (Iowa 1987) ("[P]atience with parents can soon translate into intolerable hardship for their children."). The court made the necessary findings for termination of parental rights pursuant to section 232.116(1)(h).[5] The court did not specifi-

5. Although the law requires a "full measure of patience with troubled parents who attempt to remedy a lack of parenting skills," Iowa has built this patience into the statutory scheme of Iowa Code chapter 232, including a six-month limitation for children in need of assistance aged three and below, and a twelve-month limitation for children in need of assistance aged four and above. See Iowa Code §§ 232.116(1)(f)(3), 232.116(1)(h)(3); In

cally address the issue of the child's placement, except to note the child was doing well in his current placement and DHS had recently worked with the Wisconsin family as requested by the tribe.

■ Having determined it was in the child's best interests for parental rights to be terminated, the court assigned DHS to serve as custodian and guardian of the child. *See* Iowa Code § 232.117(3)(a). Although the juvenile court has responsibility for continued oversight, DHS was charged to "make every effort to establish a stable placement for the child by adoption or other permanent placement." *See* Iowa Code § 232.117(6). DHS also has the responsibility to advise the court on a regular basis of the status of the child's placement and efforts being made towards permanency and adoption. *See* Iowa Code § 232.117(6)–(8). The legislature, while giving the juvenile court continuing oversight consistent with the best interests of the child, did not give the juvenile court the right to establish custody or consent to adoption. *See* Iowa Code §§ 232.117(3)(a), 232.117(6)–(8). Rather, these rights were specifically granted to the guardian subject to placement preferences for an Indian child. *See* Iowa Code §§ 232.117(6)–(8), 232B.9. ICWA requires that to the greatest extent possible, an Indian child must be placed into "a foster home, adoptive placement or other type of custodial placement that reflects the unique values of the child's tribal culture" and that "is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the Indian child's tribe and tribal community." Iowa Code section 232B.3(2) (defining the "best interests of the child" by specifically observing placement preferences and considerations).

This child had been removed from the parents' care for all but ten days of his life, while he was hospitalized following his birth. The court found the grounds for termination existed and termination was in the best interests of the child. The permanency orders entered by the court in September and December 2010 had not been appealed. The court did not err in addressing termination of parental rights in March and April 2011.

■ Again, the paramount interest of the ICWA is the protection of the best interests of the Indian child. *J.L.*, 779 N.W.2d at 492. Where the child's best interests override tribal or family interests, preferences for placement should not be followed. *See id.* Specifically, section 232B.9(2) provides the placement of an Indian child shall be in a setting where the child's special needs are met.

Under the facts and circumstances of this case, only termination will result in D.S.'s special medical needs being met. *See* Iowa Code § 232B.9(2). D.S.'s special needs have been met in his current foster family placement for more than one year. The record is replete with lists of D.S.'s medical needs, including appointments, medication, and treatment. His foster family has taken him to more than fifty-four different appointments over the course of the past year. They take his blood pressure, monitor his food intake, conduct breathing treatments, administer medications, transport him for emergency treatment when necessary, and keep a daily log to report to doctors. In addition, D.S. has undergone several surgeries, and the foster family has stayed with him in

*re D.A., Jr.*, 506 N.W.2d 478, 479 (Iowa Ct. App.1993). Once the statutory limits established in section 232.116 have passed, "the

rights and needs of the child rise above the rights and needs of the parents." *J.L.W.*, 570 N.W.2d at 781.

the hospital and aided his recovery. Even the tribe's social worker agreed D.S.'s out-of-home placement was appropriate considering his medical challenges. By all accounts, the child's current placement pending adoption is "in a setting where the child's special needs are met." *See* Iowa Code § 232B.9(2).

### B. Factors in Termination.

Even if a statutory ground for termination is met, a decision to terminate must still be in the best interests of a child after a review of section 232.116(2). *P.L.,* 778 N.W.2d at 37; *see also J.L.,* 779 N.W.2d at 492. In determining best interests, this court's primary considerations are "the child's safety, the best placement for furthering the long-term nurturing and growth of the child, and the physical, mental, and emotional condition and needs of the child." *P.L.,* 778 N.W.2d at 37. Taking these factors into account, we conclude the child's best interests require termination of the father's and mother's parental rights.

The mother contends termination is not in the best interests of the child. She notes that evidence introduced at trial showed she "was bonding to D.S. and learning his complex medical needs." She also states she "was making positive changes in her life, including taking responsibility for her past legal problems by working closely with her parole officer and getting her alcohol treatment set up in Wisconsin." The mother also alleged she was committed "to being a family and co-parenting with the father." The mother also requested an additional six months to learn D.S.'s special needs and resume care of the child.

The mother has had over 16 months to address her issues. True, the mother's lengthy incarceration during these proceedings had an impact on her ability to learn to care for the child, but the incarceration was a result of her own decisions and lifestyle. *See In re M.M.S.,* 502 N.W.2d 4, 8 (Iowa 1993) (observing that a parent's incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with a child). In addition, the mother's commitment to the father is concerning, because the father continues to actively use marijuana. We will not gamble with a child's future by asking him to continuously wait for a stable biological parent, particularly at such a tender age. *See In re D.W.,* 791 N.W.2d 703, 707 (Iowa 2010). The juvenile court considered evidence from caseworkers and the guardian ad litem that the child's interests are best served by termination of parental rights and concluded:

> Both parents have significant substance abuse issues. Mother has not demonstrated that she can maintain her sobriety for extended periods of time outside treatment or correctional facilities. Father continues to actively use marijuana. Neither parent is employed, has transportation, or fully understands the medical needs of the child.

The child is not safe in the parents' care, and the parents are not able to provide for his long-term nurturing and growth. It would be a detriment to the child's physical, mental, and emotional condition to maintain these parent-child relationships.

### C. Exceptions or Factors against Termination.

Finally, we give consideration to whether any exception or factor in section 232.116(3) applies to make termination unnecessary, including the presence of evidence "that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *See* Iowa Code § 232.116(3)(c). The factors weighing against termination in sec-

475

tion 232.116(3) are permissive, not mandatory. *See P.L.*, 778 N.W.2d at 38; *In re J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct.App. 1997). The court has discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship. *In re C.L.H.*, 500 N.W.2d 449, 454 (Iowa Ct.App.1993).

 Any bond that exists between the parents and the child in this case is limited considering the child's young age and the time he has spent out of their care. Visitation has been minimal as a result of the parents' incarceration and the child's medical needs. The child has lived in the same foster family home since his removal in January 2010. He is bonded to that family, and they are willing to adopt him. The family in Wisconsin may also be a suitable adoptive family. Under these circumstances, we cannot maintain a relationship where there exists only a slim possibility the father or mother will become a responsible parent sometime in the unknown future.

### IV. Conclusion.

There is clear and convincing evidence that grounds for termination exist under section 232.116(1), termination of parental rights is in the child's best interests pursuant to 232.116(2), and no consequential factor weighing against termination in section 232.116(3) requires a different conclusion. Further, the ICWA requirements under chapter 232B are satisfied because (1) there is clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family pursuant to section 232B.5; (2) evidence exists beyond a reasonable doubt that continued custody of the child by the parents is likely to result in serious emotional or physical damage to the child under section 232B.6; and (3) there is qualified expert witness testimony in the record to support these findings pursuant to 232B.10. We affirm termination of the father and mother's parental rights.

**AFFIRMED ON BOTH APPEALS.**