# IN THE COURT OF APPEALS OF IOWA

No. 16-1101
Filed September 14, 2016

IN THE INTEREST OF J.O.
Minor Child,

M.H., Father,
    Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, Craig M. Dreismeier, District Associate Judge.

A father appeals from the order terminating his parental rights. **AFFIRMED.**

J. Joseph Narmi, Council Bluffs, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Maura C. Goaley, Council Bluffs, for minor child.

Considered by Danilson, C.J., and Mullins and Bower, JJ.

**DANILSON, Chief Judge.**

A father appeals from the order terminating his parental rights pursuant to Iowa Code section 232.116(1)(e) and (h) (2015).[1]  Under section 232.116(1)(e), the juvenile court may terminate parental rights if it finds:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.
> (3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so.

The juvenile court may terminate parental rights under subparagraph "h" if:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Our review of termination decisions is de novo.  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).

The child was born in May 2015 with methamphetamine in his system and was removed from the mother's care upon discharge from the hospital.  The father was not involved with services until his paternity was established in October 2015.[2]  The father tested positive for methamphetamine on numerous

---

[1] The mother's rights were also terminated.  She does not appeal.
[2] The father admitted being told he was the child's father before the child's birth, but he declined any services until paternity was established.

occasions throughout the juvenile court proceedings. At the time of the termination hearing, which spanned four dates between April 25 and May 20, 2016, the father acknowledged he continued to use illegal substances at least through early 2016 and was involved in intensive outpatient treatment for substance abuse.

The child was almost one year old at the termination hearing, had been adjudicated a child in need of assistance, was removed from the custody of the mother, and had never been in the father's care or custody. The father acknowledged he had not maintained sobriety throughout the proceedings. He testified he used substances—marijuana and methamphetamine—as a "painkiller" because he had been injured in a 2009 motorcycle accident that left him with chronic back pain.

The father continues to have unresolved substance-abuse issues as he missed six out of twelve substance-abuse meetings and at least seven drug screens. Attendance at visitations began sporadically, although, to the father's credit, he was doing better attending visitations the last few months before the termination hearing. While the child does have a bond with the father, the child is strongly bonded with the foster parents and doing well in their care.

Upon our de novo review, we find clear and convincing evidence to support termination under section 232.116(1)(h). Moreover, "giv[ing] primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child," we conclude termination of parental rights is in the child's best interests. Iowa Code § 232.116(2); *see also In re P.L.*, 778

N.W.2d 33, 41 (Iowa 2010) ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."). And while we acknowledge a bond has grown since the father began to participate in supervised visits, we do not find that bond is such that termination of parental rights would be detrimental to the child, who is closely bonded to the pre-adoptive foster parents—the only home the child has known. *See In re D.S.*, 806 N.W.2d 458, 474-75 (Iowa Ct. App. 2011) (stating "[t]he factors weighing against termination in section 232.116(3) are permissive, not mandatory," and the court may use its discretion, "based on the unique circumstances of each case and the best interests of the child, . . . to apply the factors in this section to save the parent-child relationship"). We add, if the father's bond were as significant as he contends, we would have expected better performance in both attending substance abuse sessions and in completing drug testing in some format.[3]

The father also argues that termination of his rights is improper because he is a German national and the German consulate was not notified of the proceedings, citing articles 36 and 37 of the Vienna Convention on Consular Relations.[4]

---

[3] The father contended he was allergic to the drug patch screen as it caused a rash, but no evidence of a rash was ever noticed by DHS. At the termination hearing, he testified that he would not participate in any drug patch or hair stat testing.

[4] *Vienna Convention on Consular Relations & Optional Protocol on Disputes*, Vienna Convention on Consular Relations, arts. 36, 37, Apr. 24, 1963, 21 U.S.T. 77, 102, 596 U.N.T.S. 261, 292-93. The cited articles provide, in part:

    Article 36
    Communication and contact with nationals of the sending State

The father did not raise the matter of his nationality until the termination proceeding. On April 25, 2016, the father moved to continue the hearing, arguing that to proceed would violate his parental rights "in violation of Article 37 of the Vienna Convention on Consular Relations" because "a competent consular post without delay has not been contacted in this case."

---

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State . . . is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

Article 37
Information in cases of deaths, guardianship or trusteeship, wrecks and air accidents

If the relevant information is available to the competent authorities of the receiving State, such authorities shall have the duty:

. . . .

(b) to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State. The giving of this information shall, however, be without prejudice to the operation of the laws and regulations of the receiving State concerning such appointments; . . . .

He also argued:

[M]oving forward at this point in time would be in direct violation of Article 36 of the Vienna Convention on Consular Relations. The State clearly has custody of [J.O.] at this point in time, and [the father] is not allowed at this point in time to take custody of his own German flesh and blood, and therefore, this directly violates [the father's] rights and [J.O.'s] rights under Article 36.

The juvenile court asked for further information and stated it would defer its ruling.

On May 2 when the hearing resumed, the court asked,

What proof do you have other than your statement or your client's statement that he is, in fact, a German national and this is something that I even need to be concerned with.
     And I guess, Mr. Narmi [father's counsel], while you're discussing it, what proof do you have that child is a German national as well? So those are the two questions I have.

Testimony continued. The caseworker testified that the father did not provide any contact information for any family members and had informed the caseworker he had no contact with his father for thirty years. The paternal grandfather did visit the United States for five weeks in March and April 2016 and at that time provided the caseworker with his address in Germany.

The Family Safety, Risk, and Permanency provider testified on May 2 and on May 11, when the hearing again resumed, stating that when providing supervised visits with the father he had indicated he used methamphetamine and reported being in substance-abuse treatment currently. She stated he admitted his last methamphetamine use was six weeks prior; however, she believed it was more recent because of his lack of calling in for drug testing. She testified that the father had been consistent with twice-weekly visits since February 2016 and

that the visits went well. She also stated she met the paternal grandfather at a visit and the grandfather watched the interactions between father and child.

The father renewed his motion to continue the hearing and moved to dismiss the proceeding based on the earlier Vienna Convention argument. The court again deferred its ruling.

The father testified he was forty-six years old, was born and had lived in Germany for twenty-seven years, and then moved to the United States. He produced a German passport and United States permanent resident card. When asked if his child was a German national, he responded, "I believe so, yes." He testified his father had recently visited him in the United States and stayed for five weeks.

When the hearing again resumed on May 20, the father continued with his testimony. He stated he had not contacted the German consulate with respect to the juvenile proceedings. The father also testified that the last time he had visited Germany was in 2007 or 2008 and he had not returned since he had purchased his house here in the United States. When asked if the child had a German identification card or documentation, the father stated: "Not since I didn't talk to anybody in the German consulate about it."

On June 16, the juvenile court included in its termination order that because the father had never been confined and because the child was a United States citizen, "this court does not believe the provisions of the Vienna Convention prohibit or otherwise impact this court's ability to proceed with the termination of parental rights process."

On appeal, the father maintains that the Vienna Convention has been violated and the termination order should be reversed. We disagree. Even assuming that the Convention is applicable in this situation, in the context of a criminal conviction our supreme court has determined that a violation of consular notification regulations did not require reversal. *State v. Lopez*, 633 N.W.2d 774, 783 (Iowa 2001). In *Lopez*, the court stated:

> [T]he defendant has the burden of establishing that "(1) he did not know of his right; (2) he would have availed himself of the right had he known of it; and (3) 'there was a likelihood that the contact [with the consulate] would have resulted in assistance to him. . . .'" [*United States v.*] *Villa-Fabela*, 882 F.2d [434,] 440 [(9th Cir. 1989)] (quoting *United States v. Rangel-Gonzales*, 617 F.2d 529, 530 (9th Cir. 1980)). We adopt this test, but further recognize that "it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction *without some showing that the violation had an effect on the trial.*" *Breard* [*v. Greene*], 523 U.S. [371,] 377 [(1998)] (emphasis added).

*Id.* The father has not established any likelihood that contact with the German consulate would have had an effect on the termination proceeding.

Moreover, other courts having addressed challenges to juvenile court proceedings have ruled compliance with the Vienna Convention is not a jurisdictional prerequisite. *See In re Stephanie M.*, 867 P.2d 706, 713 (Cal. 1994) ("[T]he Convention expressly provides that the operation of the receiving state's laws is in no way dependent upon the notice prescribed by the Convention. Thus there is no merit to the contention that any delay in notice to the Mexican consulate deprived the California court of jurisdiction."); *In re R.W.*, 39 A.3d 682, 699 n.8 (Vt. 2011) ("[F]ailure to give notice to a consulate, even when required by the Vienna Convention, does not invalidate jurisdiction assumed without such notice."); *see also In re Angelica L. & Daniel L.*, 767

N.W.2d 74, 90 (Nebr. 2009) (noting some "jurisdictions have considered the same issue and have concluded that compliance with the Vienna Convention is not a jurisdictional prerequisite," "[o]ther jurisdictions have concluded that state courts do not lose jurisdiction for failing to notify the foreign consulate as required by the Vienna Convention unless the complainant shows that he or she was prejudiced by such failure to notify," and "where there is actual notice, jurisdictions decline to invalidate child custody proceedings based on violations of the Vienna Convention" (footnotes and citations omitted)); *In re L.A.M.*, 996 P.2d 839, 841 (Kan. 2000) ("The focus of the treaty is, therefore, on promoting peaceful international relations and not on specific rights of individual citizens.").

We affirm the termination of the father's parental rights.

**AFFIRMED.**