# IN THE COURT OF APPEALS OF IOWA

No. 19-1634
Filed January 9, 2020

**IN THE INTEREST OF A.C.,**
**Minor Child,**

**C.H., Father,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.


　　A father appeals the termination of parental rights to his minor child.
**AFFIRMED.**


　　Joseph G. Martin, Cedar Falls, for appellant father.

　　Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

　　Tammy L. Banning of the Juvenile Public Defender Office, Waterloo, guardian ad litem for minor child.


　　Considered by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

C.H., the father, appeals the termination of his parental rights to A.C., born in October 2017. The Iowa Department of Human Services (DHS) removed the child from the parents' care shortly after birth because of concerns over the mother's mental health and substance abuse.[1] DHS placed the child with the maternal great-grandmother after removal. No parent ever regained care.

At the time of A.C.'s birth, the father was not in a relationship with the mother and not involved with the child. The mother told him he was the father soon after birth, but then she quickly asserted another man was the father. He complains he was unaware he was the father until several months after the birth. Yet in a separate proceeding to establish paternity and support, the sheriff's office certified they personally served C.H. in April 2018 with notice alleging he was the father. Although he failed to participate, the court found C.H. to be the father and withheld his income for A.C.'s support. He testified his brother signed for the notice and he never received it, and he believed the child support withheld from his income was for another child of his.

With little progress from the mother, in June 2018 the State filed the petition to terminate the parental rights of the mother and C.H. On July 27, C.H. was arrested for burglary and possession of methamphetamine and marijuana. He testified he learned about the termination proceeding naming him as the father while in jail following this arrest.[2] On October 22, the juvenile court held a hearing

---

[1] At removal, the mother identified several potential fathers.

[2] His "really good friend" purportedly told C.H. that he was possibly the father of A.C. in July 2018 when she learned of the juvenile court proceedings.

on the matter, and the father participated while in jail on the pending charges. The court continued the hearing for the parents to conduct paternity testing. Later that day, C.H. pleaded guilty to second-degree burglary and the two possession charges, and the criminal court imposed a suspended prison sentence and probation.

After testing confirmed C.H. as the father, the termination hearing resumed on January 30, 2019. The juvenile court deferred permanency for both parents, ordered supervised visitation, and required mental-health and substance-abuse evaluations and other conditions:

> That during the next five months the parents would comply with all recommendations for substance abuse and mental health counseling, provide random drug tests as requested, regularly attend all scheduled visitations and take all prescribed medications. Further, the parents shall demonstrate an ability to maintain safe and stable housing for the child to return, maintain employment and follow through with services being offered. Both parents shall participate in parent education programming. Both parents shall not use illegal substances.

Persuaded by some positive developments, on June 4 the juvenile court again deferred permanency to allow a trial home placement with the father. But on June 21, when he provided a urine sample as a condition of his probation, he tested positive for amphetamines and methamphetamine. Two days later, he provided a urine sample to DHS at his request, which tested negative. Because of the positive test and a required return to the residential facility for violating probation, DHS ended the trial home placement and returned the child to the great-grandmother's care. On August 15, the juvenile court concluded the termination

hearing. The court issued its September 18 order terminating the rights of both parents.[3]

The father now appeals the termination of his parental rights. We review termination-of-parental-rights proceedings de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). We give weight to the juvenile court's factual findings, but they do not bind us. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018). The paramount concern is the child's best interests. *Id.*

The juvenile court terminated the father's parental rights under Iowa Code section 232.116(1)(h) (2018).[4] He does not contest the statutory grounds for termination. Instead, he first argues he should have six more months to work toward reunification. *See* Iowa Code § 232.104(2)(b). Tragically, by all accounts he was progressing well as a parent to A.C. until his positive drug test on June 21, 2019. This test led to a violation of his terms of probation and the juvenile court's January 30 order that he refrain from using illegal substances. The father's voluntary negative drug screen on June 23 does not negate the positive result two

---

[3] The mother initially challenged the termination of her parental rights, but she consented to termination during the hearing on August 15. She does not appeal the termination of her parental rights.

[4] Under section 232.116(1)(h), the court may terminate parental rights if,
> The court finds that all of the following have occurred:
> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

days earlier. And this drug use follows his history of drug-related criminal activity. C.H. has a significant criminal history, including a discharged ten-year prison sentence for burglary. Most troubling are his substance-abuse-related offenses. Throughout the juvenile proceedings, C.H. denied his guilt for his crimes, denied using drugs, and minimized the positive result by claiming his probation officer "was kind of confused about why one [test] was positive and the other one was negative." By contrast, a DHS worker testified his probation officer made clear the positive drug result was accurate. Simply put, the father has a history of refusing to take responsibility for his criminal behavior, including a lack of candor about drug use underlying his criminal convictions with that same DHS worker in this proceeding. A six-month extension is unlikely to address these concerns.

A.C. has lacked permanency almost since birth in October 2017. The father did not assert his parental rights until the child was a year old. But he should have known his parental status since at least service of the notice of the paternity and support proceeding on April 16, 2018, and he should have suspected he was the father based on his conversation with the mother soon after birth. A.C. is now over two years old and should not continue waiting for permanency. *See In re D.S.*, 806 N.W.2d 458, 474 (Iowa Ct. App. 2011) ("We will not gamble with a child's future by asking him to continuously wait for a stable biological parent, particularly at such a tender age."). We agree with denying the father additional time to work toward reunification.

Second, the father argues the juvenile court should have established a guardianship instead of terminating his parental rights. However, "a guardianship is not a legally preferable alternative to termination." *In re A.S.*, 906 N.W.2d 467,

477 (Iowa 2018) (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)). Establishing a guardianship would continue the uncertainty surrounding A.C. since birth. While the father raises concerns about the great-grandmother's ability to raise A.C. to adulthood if she were to adopt, the actual adoption choices are beyond our consideration in the termination process. DHS will determine suitable adoptive parents. We decline to order a guardianship and affirm the termination of the father's parental rights.

**AFFIRMED.**