**IN THE COURT OF APPEALS OF IOWA**

No. 24-1321
Filed December 4, 2024

**IN THE INTEREST OF B.L.,**
**Minor Child,**

**J.W., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Lynn Poschner, Judge.

The mother appeals the termination of her parental rights. **AFFIRMED.**

Lisa K. Pendroy, Des Moines, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Nancy L. Pietz of Pietz Law Office, Des Moines, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., and Buller and Langholz, JJ.

**GREER, Presiding Judge.**

The juvenile court terminated the mother's parental rights to B.L., born in 2020, pursuant to Iowa Code section 232.116(1)(e), (g), and (h) (2024). The mother appeals, purporting to challenge two of the three statutory grounds, arguing the loss of her rights is not in B.L.'s best interests, and claiming an additional six months would remedy the need for removal. In the alternative, the mother maintains the juvenile court should have resolved the child-in-need-of-assistance (CINA) case via a bridge order transferring jurisdiction to the district court, which could then enter a custody order, thereby avoiding termination. After considering the mother's arguments and reviewing the record, we affirm.

We review the termination of parental rights de novo. *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022). Employing de novo review means we "review the facts as well as the law and adjudicate the parent['s] rights anew." *Id.* That said, we review only those issues that—after being properly preserved—are actually raised and briefed on appeal by the parent challenging termination. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996).

Here, the mother purports to challenge whether the State proved the grounds for termination under paragraphs (g) and (h) of section 232.116(1). But we need not consider whether the mother properly developed arguments or challenged the elements that make up those grounds, as she does not challenge termination under section 232.116(1)(e) (failure to maintain significant and meaningful contact). Although the mother referenced paragraph (e) in the heading of her petition on appeal, no analysis or discussion related to that particular section was developed. Because we need only one ground to affirm, *see In re A.B.*, 815

N.W.2d 764, 774 (Iowa 2012), and the mother's failure to make an argument challenging termination under paragraph (e) constitutes waiver of that issue, *see In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010), we conclude there is clear and convincing evidence for termination under section 232.116(1)(e). *See In re Z.H.*, No. 24-1225, 2024 WL 4370058, at *2 (Iowa Ct. App. Oct. 2, 2024) (recognizing that "generally, when a parent fails to challenge a specific ground relied on by the juvenile court, we affirm on that ground or grounds without further consideration").

The mother asks for six more months to work toward reunification. To give a parent additional time, the court must be able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). The mother, who was living on the streets and unemployed at the time of the July 2024 termination trial, contends that things will improve in the next six months. We acknowledge the mother's testimony that she expected to have housing by September 1, for which she would receive financial assistance for about six months. The mother believed she would find employment during that window of time, allowing her to maintain housing even after the financial assistance ended. While housing was a major issue the mother was dealing with, there are other issues that affect her ability to safely parent B.L.

The Iowa Department of Health and Human Services became involved with the family this time in June 2023 after the mother took B.L. to the hospital for the two-year-old's "behaviors." Medical professionals at the hospital recognized the mother was experiencing a mental-health crisis, which included delusions; she was

involuntarily committed by court order. According to the mother's testimony, after she was released from the hospital's care, she discontinued taking the prescribed mental-health medication because "[i]t was actually making [her] worse." The mother medicated with marijuana instead. This was not the mother's first struggle with mental health; the mother's rights were terminated to two children in 2013 and another child in 2014 based at least in part on similar concerns. In the 2013 termination order, the court found: "The [m]other struggles deeply with her mental health, and [she] is inconsistent in her treatment and medication management" and "The [m]other has great need for high level mental health engagement, and she simply hasn't taken advantage." The court made similar findings in the 2014 termination order.

At the July 2024 termination trial, the mother's testimony showed she still lacked insight into her mental health and had not yet started taking necessary steps to address the issues. She testified she "wasn't mentally unwell when they put [her] in the psych ward" and denied needing the mental-health medication that was prescribed to her. In her testimony, she was uncertain about her diagnoses and had not been engaged in therapy in more than eight months. While the mother testified she recently obtained a new mental-health medication manager who would help her with her mental-health needs, including getting back into therapy, we cannot say it was likely B.L. could safely return to the mother's custody within six months. We agree with the juvenile court—"[i]t is not in [B.L.'s] best interest for this case to remain open when the evidence shows that the circumstances will be the same in six months as they are right now."

Finally, in the alternative, the mother argues the juvenile court should have closed the CINA case and transferred jurisdiction to the district court via a bridge order, allowing the district court to then enter an order "over the child's custody, physical care, and visitation." *Id.* § 232.103A(1). The mother maintains this option—rather than termination of her rights—is in B.L.'s best interests because it allows the child to keep a relationship with her while remaining safe in the father's custody. *See id.* § 232.116(2) (requiring the court, when considering the child's best interests, to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child"); *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. Oct. 5, 2011) ("The paramount concern in termination proceedings is the best interests of the child."). The juvenile court considered and denied the mother's request for a bridge order, ruling:

> [B.L.] is very young and has now been out of his mother's custody for almost one third of his life. He cannot safely return to her now. There is no reason to believe that he will be able to return to her custody within six months, or any reasonable time, when [she] either cannot or will not accept that the real reasons that she is not able to safely parent [B.L.] is her need for mental health care and follow through with services. [The mother] and [B.L.] have had positive interactions in the past, with supervision. But [the mother] has not had contact with [the child] in seven months. Further, [she] has not shown interest or action in remaining informed on [B.L.'s] well-being in the past seven months. Given these facts, there is not a benefit to [B.L.] to maintaining this legal relationship.
> It is in [B.L.'s] best interest to have an established, permanent, safe, and dedicated caregiver. His father is able to do that. But a transfer of custody and bridge order are not in [B.L.'s] best interest. [The mother] is unlikely to change, so if a bridge order were entered, it would have to be with the presumption that [she] will continue to have the same risk factors she has now. A bridge order in this case would have to be highly restrictive of [the mother's] contact with [B.L.] It may not even include rights of visitation, at least not until some safety measures were in place to assure [the mother's] safe

interactions with [B.L.], such as mental health care. There is no reason to think that [the mother] would actually maintain services given the history. This begs the question then, what use a bridge order would serve, other than to keep [B.L.] in the middle of litigation as he is now. Litigation means that [B.L.] has the stress of knowing that his life, home, and caregiver might all change. This is not best for him, especially when he has already had sudden changes in his caregivers and uncertainty. He has shown signs of anxiety throughout the case.

Further, [the mother] continues to blame this CINA on [the father] ending their relationship. Although not recently, she continued to report for months that he was abusing and harassing her when there was no evidence of this at those times. There is no reason to think that she would not make such claims again in the future, causing continued tumult for [B.L.] [The mother] testified that she does not support a custody order wherein [the father] would have primary custody of [B.L.] There is no reason to think that [she] would work with [the father] cooperatively or prioritize [the child's] best interest.

We adopt the juvenile court's well-reasoned explanation and agree that a bridge order is not in B.L.'s best interests. Because of the acrimony between the parents and the mother's history of false allegations against the father suggests she could be disruptive to and jeopardize B.L.'s stability in the future, termination of her rights is in B.L.'s best interests. *See In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) ("A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests.").

We affirm the termination of the mother's parental rights.

**AFFIRMED.**