**IN THE COURT OF APPEALS OF IOWA**

No. 17-0929
Filed August 16, 2017

**IN THE INTEREST OF Z.S.,**
**Minor Child,**

**B.S., Father,**
    Appellant,

**K.B., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Susan C. Cox, District Associate Judge.

A mother and father separately appeal the termination of their parental rights to their four-year-old son. **AFFIRMED ON BOTH APPEALS.**

Ryan R. Gravett of Oliver Gravett Law Firm, Windsor Heights, for appellant father.

Thomas P. Graves of Graves Law Firm, P.C., Clive, for appellant mother.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Karl Wolle of Juvenile Public Defender's Office, Des Moines, guardian ad litem for minor child.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

A mother, Kelsey, and a father, Brad, separately appeal the juvenile court order terminating their parental relationship with their four-year-old son, Z.S. Kelsey argues the State failed to prove a statutory basis for termination, termination was not in Z.S.'s best interests, and the juvenile court should have declined to terminate because the maternal grandmother had custody of Z.S. Brad contends the Iowa Department of Human Services (DHS) failed to make reasonable efforts to provide reunification services by not offering visitation while he was incarcerated. He also argues termination was not in Z.S.'s best interests. Upon our independent review of the record,[1] we find clear and convincing evidence supporting the conclusions of the district court.

## I. Facts and Prior Proceedings

In November 2014, one-and-a-half-year-old Z.S. came to the attention of the DHS through a report Kelsey and Brad were using methamphetamine. Both parents tested positive for the drug, and Kelsey also tested positive for tetrahydrocannabinol (THC), the active component of marijuana. Kelsey immediately entered inpatient treatment at House of Mercy with Z.S., but she left after three days, instead opting for an outpatient treatment program. Brad too entered outpatient substance-abuse treatment, and he reached maximum benefits from the program in late March. His provider recommended continuing

---

[1] We review child-welfare proceedings de novo, which means we examine both the facts and law and adjudicate anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). We are not bound by the factual findings of the juvenile court, but we give them weight. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Proof must be clear and convincing, which means we see no "serious or substantial doubts as to the correctness [of] conclusions of law drawn from the evidence." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

care, in which Brad participated inconsistently. Both parents completed psychological assessments resulting in recommendations for therapy. Kelsey did not seek treatment; Brad attended therapy sporadically.

The juvenile court adjudicated Z.S. a child in need of assistance (CINA) on April 21, 2015, following an uncontested hearing. The court determined Kelsey was no longer using illegal drugs and allowed Z.S. to remain in her care. Brad remained in the home, but the DHS required his contact with Z.S. to be supervised by Kelsey.

Following the adjudication, Kelsey successfully completed substance-abuse treatment. But as time went on, conflict between Kelsey and Brad intensified. The two separated in early November 2015, shortly after Brad was arrested for driving without a license. On November 9, at Kelsey's request, the district court issued an order prohibiting Brad from having contact with her.

After receiving notice of the no-contact order, Brad sent text messages to Kelsey and DHS social workers leading them to believe he had attempted to commit suicide. Brad, who had a history of suicidal ideation, eventually admitted himself to the local hospital for mental-health treatment. But he did not seek regular treatment after his release.

Although the no-contact order remained in effect, in February 2016, Brad moved back in with Kelsey. Kelsey also began allowing Brad to have unsupervised contact with Z.S. Brad was arrested for violating the no-contact order in March 2016. Z.S. was in his care at the time. As a result of the arrest, the district court revoked Brad's probation for possession of a controlled

substance as an habitual offender, and he remained incarcerated for the balance of the case.[2]

The juvenile court ordered Z.S.'s removal from Kelsey's care that same month. The DHS eventually placed Z.S. with his maternal grandmother, and he remains in her care.

At the time of removal, Kelsey refused to comply with DHS requests she submit to drug screens. Accordingly, the court ordered Kelsey to submit to drug testing in May 2016. She did not comply until July 26, and she tested positive for amphetamine and methamphetamine at that time. After Z.S.'s removal, Kelsey was inconsistent with visitation. She lost her housing and began sleeping in "drug houses" or her car. Kelsey moved in with a cousin around June but continued to use illegal drugs.

The State filed a petition to terminate the rights of both parents on September 23, 2016. But the State requested a continuance of the termination hearing after learning Kelsey had entered inpatient treatment at House of Mercy. The court granted the State's request.

The records from House of Mercy revealed the extent of Kelsey's substance abuse. In her screening interview, Kelsey stated she had last used methamphetamine on September 13, 2016. She reported a pattern of injecting the drug two to three times a day. The treatment provider found Kelsey met the DSM V criteria for severe amphetamine use disorder.

---

[2] The district court ordered Brad to be incarcerated for a period not to exceed fifteen years. Based on this information, DHS workers believed Brad's expected release date from prison would be January of 2023. Brad testified at trial he expected to be released on parole in October 2017.

While at House of Mercy, Kelsey transitioned to overnight weekend visits with Z.S. But Kelsey's progress in treatment soon waned. She tested positive for THC on January 15, 2017.[3] Kelsey told service providers she went to a friend's house where other guests were smoking marijuana. She denied smoking the drug but admitted to staying for a few hours. At a family team meeting, service providers expressed concern Kelsey was showing other signs of relapse, such as skipping sessions and lacking engagement in the sessions she did attend. Kelsey's providers also became increasingly concerned about her honesty. In one instance, House of Mercy staff granted Kelsey a pass to spend the day with her Narcotics Anonymous (NA) sponsor, but when an employee from House of Mercy contacted the NA sponsor, she discovered Kelsey had not used the pass to meet with her sponsor, nor had she seen or spoken with her sponsor in more than a month.

Kelsey was unsuccessfully discharged from House of Mercy in early February 2017. In her discharge summary, Kelsey's substance-abuse provider noted:

> Kelsey has made minimal progress during her five month stay of inpatient treatment. Client has spent the majority of her time being caught up in addictive and criminal thinking patterns. Client continuously manipulated staff and circumstances in an effort to get her way. Client was often unwilling to accept feedback, take accountability for poor decisions. She lacked the ability to make positive choices and make necessary efforts in order to effect change in her own life.

Her provider concluded Kelsey needed "long term residential treatment" to properly address her substance-abuse disorder.

---

[3] Kelsey reportedly completed a negative drug screen in the days before and after this result. Those test results were not admitted as exhibits at the termination hearing.

After her discharge, Kelsey moved in with a cousin and began outpatient treatment at a different facility, which consisted of one day of treatment and two AA or NA meetings each week. Records from the provider verified Kelsey had attended group therapy three times and missed twice in her first five weeks of treatment. According to Kelsey, her new treatment provider did not offer drug screens. She requested the DHS to authorize a drug screen, but the DHS denied her request.[4]

The termination hearing took place on March 8 and 31, 2017. By the time of the hearing, Kelsey had reverted to supervised visitation with Z.S. Brad had not visited or spoken with Z.S. since his arrest the year before. In a detailed ruling issued on May 30, 2017, the juvenile court terminated the parental rights of Brad under Iowa Code section 232.116(1)(e) (2017), and both Brad and Kelsey under section 232.116(1)(h).

Both parents appeal the juvenile court's order.

## II. Analysis of Mother's Issues

### A. Statutory Ground

Kelsey argues the State failed to prove a statutory ground for termination. The juvenile court terminated her rights under Iowa Code section 232.116(1)(h). To terminate under that subsection, the State was required to prove, by clear and convincing evidence, Z.S. (1) was three years old or younger; (2) had been adjudicated CINA; (3) had been removed from Kelsey's physical custody for at

---

[4] When asked about the denial at the termination hearing, a DHS social worker explained: "[A] clean screen to me does not warrant a change of recommendation, and when clients ask me to drop and tell me on a Monday or a Tuesday that they want me to drop, then I'm not going to drop them, when they are asking, because it's not random." Kelsey provided a negative drug screen on March 17.

least six of the past twelve months, or for the last six consecutive months with any trial period at home lasting under thirty days; and (4) could not be returned to Kelsey's custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h). Kelsey challenges the first and fourth requirements.

First, Kelsey argues the State failed to prove the age requirement of subsection (h) because, although Z.S. was three years old at the time of the termination hearing, he had turned four by the time the juvenile court issued its termination order. We find this argument to be without merit. For the purposes of section 232.116, "we measure the child's age at the time of the termination hearing, not at the time the termination order was entered." *See In re R.W.*, No. 15-2024, 2016 WL 899269, at *1 (Iowa Ct. App. Mar. 9, 2016); *see also In re N.N.,* 692 N.W.2d 51, 53 (Iowa Ct. App. 2004) (finding Iowa Code section 232.116(1)(h) applies to "children who are past their third birthday but who have not yet reached age four" at the time of the termination hearing).

Second, Kelsey argues Z.S. could have been safely returned to her care, reasoning: "Mother is employed. She can live with grandmother. She is drug-free. She continues to seek treatment to remain drug-free." We disagree with Kelsey's assessment of her progress. By Kelsey's own account, she again began using methamphetamine in March 2016. But she delayed seeking treatment for another six months. Once she entered treatment, Kelsey's progress was "minimal" and her poor choices led to an unsuccessful discharge. Further, Kelsey's attendance at outpatient treatment after her unsuccessful discharge was inconsistent. Even if we credited Kelsey's testimony that she was no longer using methamphetamine at the time of the termination hearing, her

lack of commitment in treatment makes us doubt her ability to maintain sobriety. Accordingly, we agree with the juvenile court that Z.S. could not be safely returned to Kelsey's care at the time of the termination hearing. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children.").

## B. Best Interests

Kelsey next argues termination of her parental rights was not in Z.S.'s best interests "[b]ecause of the close relationship of mother and child, because mother is clean and sober, because mother is ready, willing and able to care for Z.S., [and] because she has strong family support." In our evaluation of Z.S.'s best interests, we give primary consideration to Z.S.'s safety, to the best placement for furthering his long-term nurturing and growth, and to his physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2); *see also In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010).

Termination is in Z.S.'s best interests. Throughout the proceedings, Kelsey struggled with substance-abuse issues. Her lack of engagement in treatment—despite the imminence of the termination hearing—demonstrated an inability to truly address her addiction. Although we do not doubt Kelsey's love for her son, these proceedings have left Z.S. in limbo for nearly three years. Z.S. should not have to continue to wait for his mother to achieve sobriety and stability. *See P.L.*, 778 N.W.2d at 41 (stating courts will not deprive a child of permanency after the State has proved a statutory ground for termination "by

hoping someday a parent will learn to be a parent and be able to provide a stable home for the child").

### C. Relative Placement

Finally, Kelsey argues the juvenile court should have declined to terminate because Z.S. was placed with his maternal grandmother. Under Iowa Code section 232.116(3)(a), the juvenile court may decline to terminate the parent-child relationship when "[a] relative has legal custody of the child." But the court is not obligated to forego termination if this factor is satisfied. *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011).

Initially, Z.S. is not in the "legal custody" of his maternal grandmother. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). Further, we agree with the juvenile court's determination that delaying termination would be harmful to the child. The grandmother is willing to adopt Z.S., and Z.S. is doing well in her care. But these proceedings have been difficult for Z.S. He has exhibited behavioral issues both before and after his visitation with Kelsey. Under these circumstances, we conclude this permissive consideration does not outweigh Z.S.'s need for permanence. Accordingly, we affirm the termination of Kelsey's parental rights.[5]

---

[5] In passing, Kelsey states: "A six month extension could be granted so mother could demonstrate . . . she will stay clean and sober and continue to work toward being able to meet all the needs of Z.S." To continue a child's placement for an additional six months, the court must find the need for removal will no longer exist at the end of six months. *See* Iowa Code § 232.104(2)(b). We note the juvenile court essentially granted Kelsey an additional six months when it postponed the termination hearing after Kelsey entered substance-abuse treatment. Considering Kelsey's meager progress in that time, we cannot state with any certainty Kelsey will be prepared to resume care of Z.S. in six months. Accordingly, to the extent Kelsey asks for a six-month extension, we deny her request.

### III.    Analysis of Father's Issues

### A.  Reasonable Efforts

Brad argues the State failed to make reasonable efforts to reunify him with Z.S. He maintains the DHS should have offered him visitation while he was incarcerated. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000) (finding a parent's incarceration does not "absolve[] the department of its statutory mandate to provide reunification services under all circumstances"). The State contends error was not preserved on this claim.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002); *see also In re L.M.W.*, 518 N.W.2d 804, 807 (Iowa Ct. App. 1994) (requiring parents to raise reasonable-efforts argument before the termination hearing to preserve the claim for appellate review). At no time after Brad's incarceration in March 2016 did he raise a reasonable-efforts argument to the juvenile court. Accordingly, this claim is not preserved for our review, and we decline to address it.

### B.  Best Interests

Brad also argues termination of his parental rights was not in Z.S.'s best interests. Brad's argument hinges on Kelsey's progress throughout the proceedings. He claims: "The record presented at termination was sufficient to make a finding that should she continue the path she was on at the time of the permanency/termination hearings that a reunification would have likely occurred within the next six months." He reasons that because he would "likely be[]

released prior to the expiration of that six months . . . it is likely [Brad] would have hit the ground running with services and his commitment to his son."

Brad lacks standing to assert an argument on Kelsey's behalf "to ultimately gain a benefit for himself, that is, the reversal of the termination of *his* parental rights." *In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007). Moreover, to the extent Brad raises this claim on his own behalf, we find termination of his parental rights is in Z.S.'s best interests. Brad had been incarcerated for over a year at the time of the termination hearing. And even before his incarceration, he failed to meaningfully address his substance-abuse issues—only inconsistently participating in treatment—or his serious mental-health concerns. With these issues unresolved, Brad will not be able to foster Z.S.'s mental and physical wellbeing. We affirm the termination of Brad's parental rights.[6]

**AFFIRMED ON BOTH APPEALS.**

---

[6] Without further development, Brad also mentions "the [c]ourt could make an exception since the child is in relative placement and the parents have a close bond with the child." *See* Iowa Code § 232.116(3)(a), (c). We reject Brad's claim regarding relative placement for the reasons stated above. Moreover, Brad has been out of Z.S.'s life for more than a year. Any bond that remains between Z.S. and his father does not warrant preservation of the parent-child relationship.