**IN THE COURT OF APPEALS OF IOWA**

No. 21-0243
Filed July 21, 2021

**IN THE INTEREST OF T.F. and T.F.,**
**Minor Children,**

**T.F., Father,**
        Appellant,

**THE OMAHA TRIBE OF NEBRASKA,**
        Appellant-Intervenor.
_____

        Appeal from the Iowa District Court for Polk County, Susan Cox, District

Associate Judge.


        The father and the intervenor-tribe appeal after the juvenile court terminated

the father's parental rights.  **AFFIRMED ON BOTH APPEALS.**


        Jonathan M. Causey of Causey & Ye Law, P.L.L.C., Des Moines, for

appellant father.

        Alexis Zendejas, Macy, Nebraska, tribal representative for appellant-

intervenor the Omaha Tribe of Nebraska.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Erin E. Mayfield of Youth Law Center, Des Moines, attorney and guardian

ad litem for minor children.


        Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

This appeal involves the parental rights to T.F. and T.F., born in 2017 and 2019. The mother and father of the children are enrolled members in the Omaha Tribe of Nebraska, and both T.F. and T.F. are an "Indian child."[1] The tribe intervened early in the child-in-need-of-assistance (CINA) proceedings for the older child—the youngest was not yet born at the time—and has participated throughout.[2] In early 2021, the juvenile court terminated both parents' rights under Iowa Code section 232.116(1)(h).[3]

The father and the tribe appeal. The father maintains (1) we should consider his petition even though his notice of appeal was untimely because the delay is due to ineffective assistance from his counsel; (2) the juvenile court erred when it denied his motion to have the proceedings transferred to the jurisdiction of the tribal court; (3) the State failed to meet its burden to terminate his rights under

---

[1] "'Indian child' . . . means an unmarried Indian person who is under age eighteen years of age or a child who is under eighteen years of age that an Indian tribe identifies as a child of the tribe's community." Iowa Code § 232B.6 (2020)

[2] Both for part of the proceedings in the juvenile court and here on appeal, the tribe is represented by Alexis Zendejas. She is not admitted to practice law in Iowa, but "[a] tribe may appear in court through a non-lawyer representative in [Indian Child Welfare (ICWA)] proceedings." *In re N.N.E.*, 752 N.W.2d 1, 13 (Iowa 2008); *see also* U.S. Dep't of the Interior Off. of the Assistant Sec'y—Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act*, at 8 (Dec. 2016), available at https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf ("[One] barrier to Tribal participation in State court proceedings is that the Tribe may not have an attorney licensed to practice law in the State in which the Indian child custody proceeding is being held. Many tribes have limited funds to hire local counsel. The Department encourages all State courts to permit Tribal representatives to present before the court in ICWA proceedings regardless of whether they are attorneys or attorneys licensed in that State, as a number of State courts have already done.").

[3] The mother's parental rights were also terminated under section 232.116(1)(*l*). She did not attend either day of the two-day termination hearing, and she does not appeal.

ICWA; and (4) the State failed to make "active efforts" as mandated by ICWA. In a separate appeal, the tribe argues the juvenile court (1) erred by using the "clear and convincing" standard instead of the "beyond a reasonable doubt" standard as ICWA requires; (2) erred in relying on only one qualified expert witness (QEW) and in using their testimony outside the scope of ICWA's requirements for a QEW; (3) was wrong to find the State made "active efforts"; and (4) should have granted the motion to transfer jurisdiction to the tribe.

**I. Prior Facts and Proceedings.**

The Iowa Department of Human Services (DHS) first became involved with this family upon the birth of the oldest child, in September 2017, when both the mother and child tested positive for marijuana. The mother and father agreed to not use illegal drugs around the child, and each stated they would obtain a substance-abuse evaluation; DHS did not pursue further involvement with the family.

Over the next year, local police were called to the father's and mother's residence multiple times, including upon reports the mother was in danger from the father, that he took her phone and would not let her call for help, and that he spent days whipping the mother with an electrical cord and kicking her in the head. In relation to these calls, the father pled guilty to obstruction of emergency communications and interference with official acts in July 2018 and domestic abuse assault with intent to inflict serious injury in November 2018. The court granted the father probation for the domestic abuse assault conviction and, at the mother's request a few days later, dismissed the no-contact order between the father and mother.

Later that same month, while pregnant with the younger child, the mother went to the hospital with stomach pains. While she was there, she tested positive for methamphetamine and marijuana. According to DHS reports, the father was not tested for drugs but admitted to workers that he used methamphetamine and marijuana. DHS then opened another child-abuse investigation regarding the older child and requested removal of the child from the parents' care. Both the mother and the father consented to temporary removal and confirmed their consent to continued removal at the later hearing. The child was placed in the custody of the maternal great grandmother with DHS supervision.

The older child remained in the care of the great grandmother from the end of November 2018 until January 14, 2019. During that time, the father twice removed the child from the home. The first time, the great grandmother immediately called DHS, which involved the police, and they were able to get the child from the father relatively quickly. The second time, the great grandmother waited five days to alert anyone what the father had done. Again, DHS professionals and police were involved in getting the older child returned to the great grandmother's care. Due to these safety concerns, DHS told the great grandmother a new custodian was needed for the child. The State asked the court to modify placement, and the request was granted.

Also on January 14, 2019, the tribe filed a motion to intervene in the child-welfare proceedings. It was granted by the court.

The younger child was born in February and removed from the parents' care one day later.

At the agreement of all parties, the children were placed in the mother's care under DHS supervision on February 26.[4] As part of the return to the mother's care, she agreed she would reside with the children in a domestic violence shelter. Then, on March 1, the police were called to the parents' residence; the mother reported the father had assaulted her multiple times that day and officers observed extensive bruising. Two days later, the father was arrested for domestic abuse assault, second offense. Additionally, the father's probation officer filed a violation report. He remained in jail for approximately six months.

On March 4, the State filed a request to have the children removed from the mother's care because she never moved to the shelter and instead continued living with the father. The court granted the request for removal, and the children were returned to foster care.

On March 5, Mosiah Harlan, the ICWA supervisor with the Omaha Tribe of Nebraska and a designated QEW on ICWA matters, filed an affidavit with the court. In it, Harlan stated, "Based upon the facts, it is my expert testimony that continued custody of the children by their custodial parents is likely to cause serious emotional and physical damage to the children at this time."

The children were returned to the mother's care in late March; she agreed to live with the children's great aunt. Shortly after the children were returned, DHS received reports drugs were being used in the home. DHS asked the great aunt to complete a drug test, which she delayed for more than a month. Between mid-April and early May, the mother twice tested positive for methamphetamine and

---

[4] The children were still removed from the father's care.

amphetamines. Additionally, the aunt reported to DHS that the mother was absent for long periods of time, leaving the children in her care.

The State again moved to modify placement, which the court granted on May 8, 2019. The children were placed in the care of the great aunt. They never returned to either parent's care again.

Placement with the great aunt was short-lived. The aunt waffled on whether she could continue to care for the children and she was not consistent in taking them to scheduled or needed medical appointments. Additionally, she was experiencing issues with housing instability; she reported to DHS that her landlord sold her home and she needed to move somewhere else within a short timeframe. After the great aunt's delay in completing her first drug test, DHS sent the drug tester directly to the aunt's home for a second test—to alleviate some of the issues the aunt said led to the first long delay. The aunt refused to be tested at that time; she waited nearly a week before completing the test, which came back negative for all illegal substances. Following a review hearing in mid-June, the children were moved from the great aunt's home to a foster placement with non-Native American foster parents. The children remained in this foster home at the time of the termination hearing.

The mother continued to use methamphetamine and did not go into inpatient treatment when a bed was available for her. In spite of several serious mental-health diagnoses, the mother did not attend therapy or mental-health treatment.

The father was released from jail on August 31, 2019. He and the mother immediately continued their relationship, and it remained marred by violence. In

mid-September, the parents came to a visit together. The service provider told them they could not attend together, and the father left angrily. After he was gone, the mother told the provider she and the father had been fighting, he had taken her phone, and manipulated her using the children. She expressed that she was unsure she felt safe. The provider helped the mother call a domestic violence hotline; the mother was advised to go to the courthouse to obtain a no-contact order, and the provider drove the mother to the courthouse to do so. Yet the mother and father continued to live together.

Shortly after, on October 30, the father was jailed again. The father claimed he was in jail because he "just cut a little bit of [the mother's] hair." He remained in jail until December 3. The father was out of custody from December 3, 2019 until January 17, 2020. He completed a mental-health evaluation during this time, and it was recommended the father participate in mental-health therapy. The father and mother again attended a visit together, in spite of the no-contact order. The provider noted both were "very under the influence" and "very emotional."

The father was jailed again on January 17. He remained in the local jail until he was sent to prison in June, where he was still incarcerated at the time of the termination hearing in December. He had no visits or interactions with the children during this time.

On January 20, the juvenile court entered a permanency order changing the permanency goal to termination of the parents' rights.

Then on February 25, the tribe filed a motion to transfer jurisdiction of the cases to the Omaha Tribal Court. About four months later, the father also moved

to transfer the jurisdiction to tribal court. The children's guardian ad litem (GAL) resisted.

The hearing on the motion to transfer took place over two days in June and July. The mother did not participate on the first day because she had been committed under a substance-abuse and a mental-health order, but her attorney participated and represented her at the transfer hearing. The mother participated in the second day of the hearing.

On September 20, the court denied the motions to transfer, finding good cause to deny the requests based on the children's objection to the transfer and their best interests. The court ruled:

> First, during the past 19 months, the State, [court-appointed special advocate], and [service providers] have provided excellent supportive services for the children and the parents. They have strong relationships with the children and fully understand the parents' challenges. [The older child] has suffered from repeated traumas—due to her parents' substance abuse, instability and domestic violence. The father has twice taken [her] from placements—in violation of the court's orders. Professionals had to intervene to protect [the older child] from the father's explosive temper, in two potentially explosive situations. Also, [the child] has historically struggled in adjusting to strangers. It would be cruel to transfer her case to new professionals.
> Second, the Iowa Juvenile Court is best situated for litigation of the custody of the children and parental rights of the parents. In [the older child's] case, the court has been involved for over nineteen months and in [the younger child's] case, for sixteen months. The proceedings are at an advanced stage. The Iowa Juvenile Court has spent days with the parents—for contested litigation—and repeatedly made accommodations to ensure the mother's safe participation in court. A permanency order with respect to these children was entered on January 20, 2020. A petition to terminate parental rights has been on file for over five months and a hearing on the petition to terminate parental rights was originally scheduled to begin over four months ago. These children are in need of permanency stability and safety. This need is paramount and can best be met through a denial of the request to transfer jurisdiction and proceeding with scheduled hearings in this jurisdiction.

Third, the children's present placement is not a Native American home. However, in the present placement, through the foster parents' efforts, the children have had continued involvement and access to the Omaha Tribe as well as other Native American tribes, events, families, and culture. The foster parents have requested additional involvement, resources, and information directly from the Omaha Tribe to benefit the children and their Native American heritage and the Omaha Tribe has not responded leaving the bulk of the engagement for the children with their Native American heritage on the foster parents and the Iowa Department of Human Services. Keeping the case with the Iowa Juvenile Court does not prevent maintaining the vital relationship between Indian tribes and tribes' children and does not "interfere with the policy that the best interest of an Indian child require that the child be placed in a foster or adoptive home that reflects the unique values of Indian culture."

A two-day termination hearing was held on December 9 and 10, 2020. The father participated remotely from prison; the mother did not attend or participate either day. The father testified his discharge date was in February 2021. He also testified no one could stop him from being in contact with the mother, stating,

[The no-contact order is] going to be violated—there's going to be multiple cases here from now, in a year from now, two years from now, three years from now, after all this is said and done, that are continuing to violate that no-contact order. Why? Because there's families out here, man.

You're not going to tell me to stop talking to [the mother]. Nobody else is going to tell me to stop talking to [the mother]. I'll choose to do that if I want to.

In early February 2021, the juvenile court issued its termination order. As it was clear neither parent could resume caring for the children at the time of the termination hearing, the court concluded "[t]he issue is whether DHS provided the parents active efforts pursuant to the Indian Child Welfare Act." The court noted ways DHS went above and beyond for the family early in the proceedings, including physically helping the mother pack and move her things to a storage unit, which DHS paid for, so she could move away from the father. Additionally, a

service provider drove the mother to the courthouse to obtain a no-contact order when she felt unsafe. And extra services were provided to family members in an attempt to maintain the children's placement with them to keep the children in a home with their Native American family members. Importantly, the court continuously found active efforts were being made in its orders, and neither parent ever objected to the findings nor requested additional or different services. The court terminated both parents' rights under section 232.116(1)(h).

The father and the tribe appeal.

## II. Standard of Review.

Generally our review of the termination of parental rights is de novo and we uphold an order terminating parental rights when clear and convincing evidence supports termination. *In re D.S.*, 806 N.W.2d 458, 465 (Iowa Ct. App. 2011).

"In addition to this analysis, Iowa Code chapter 232B sets forth [ICWA], which extends further protections to Indian families and tribes." *Id.* "'[T]ermination of the parental rights of an Indian child shall not be ordered unless supported by evidence beyond a reasonable doubt that 'the continued custody of the child by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* (quoting Iowa Code § 232B.6(6)(a)). "ICWA has a dual purpose—to protect the best interests of a child and preserve the Indian culture," and we strictly construe the provisions of ICWA to these ends. *Id.*

"[W]e review the juvenile court's denial of a motion to transfer jurisdiction under section 232B.5 for correction of legal error." *In re E.D.*, No. 16-0829, 2016 WL 4379382, at *3 (Iowa Ct. App. Aug. 17, 2016) (citing *In re J.L.*, 779 N.W.2d 481, 485 (Iowa Ct. App. 2009)).

## II. Analysis.

The issues raised by the father and the tribe often overlap, and while their appeals are separate, we consider those closely-related issues together.

### A. Father's Delayed Appeal.

To begin, we determine whether we should consider the merits of the father's petition on appeal even though his notice of appeal was admittedly untimely by one day.[5] The father's attorney explained that it was his mistake that led to the notice of appeal being filed late, as he counted the fifteen days by the date the amended termination order was available on EDMS[6] rather than the date the court filed the order.[7] He asked for an extension of time to file a timely notice of appeal, and our supreme court ordered us to consider the issue.

The father's attorney raised this issue under a claim of ineffective assistance of counsel, but our consideration is guided by our supreme court's recent case law on this issue. In *In re W.M.*, 957 N.W.2d 305, 316 (Iowa 2021), the supreme court considered "whether to extend the delayed appeal process [it had] recognized in criminal cases to termination-of-parental-rights cases." *Accord In re A.B.*, 957 N.W.2d 280, 289–93 (Iowa 2021) (considering whether to accept a delayed petition on appeal in a chapter 232 termination). The court ultimately

[5] The juvenile court's amended TPR order was filed February 7, 2021, and the father's notice of appeal was not filed until February 23—sixteen days later. *See* Iowa R. App. P. 6.101(1) (requiring a notice of appeal in chapter 232 termination cases to be filed "within 15 days").

[6] EDMS stands for electronic document management system.

[7] According to the timestamp, the court filed the amended order at 8:54 p.m. on February 7, 2021, which was a Sunday night. According to the father's attorney, the order was not available to him until February 8, and he erroneously relied on that date.

recognized that "[d]elayed appeals are an exception to our jurisdictional rules." *W.M.*, 957 N.W.2d at 316. Still, the court placed limits on which delayed appeals would be accepted, stating it would "consider a delayed appeal 'only where the parent clearly intended to appeal and the failure to timely perfect the appeal was outside of the parent's control.'" *Id.* (quoting *A.B.*, 957 N.W.2d at 292). Additionally, in determining whether to accept the father's delayed appeal, we must "consider the timing of the appeal" because we "will not allow a delayed appeal to prolong the appeal process." *Id.* "The delay must be 'no more than negligible.'" *Id.* (quoting *A.B.*, 957 N.W.2d at 292). In *W.M.*, the father's notice of appeal was filed two days late, and the court concluded the father's petition on appeal could be considered. 957 N.W.2d at 316–17. So clearly the one-day delay of the father here is also negligible. And the father's attorney admitted the delay was attributable to him—not the father. For these reasons, we accept the father's delayed appeal and proceed to consider the merits.

### B. Motions to Transfer Jurisdiction.

Both the father and the tribe claim the juvenile court erred in denying their separate requests to transfer jurisdiction of the child-welfare cases to the tribe.[8] The tribe questions the right of the children's GAL to object to the transfer and, even if allowed, maintains there was not "good cause" to deny the request of the father and tribe. The tribe attacks the reasoning of the juvenile court in denying

---

[8] We conclude the father and the tribe are allowed to challenge the denial of their motions to transfer in this appeal following termination, as the order denying transfer of jurisdiction to the tribe was not a final appealable order. *See E.D.*, 2016 WL 4379382, at *6 ("The State suggests the mother waived her objection by not appealing the denial-of-transfer order. We disagree. [That] order did not dispose of all issues in the case. Accordingly, it was not a final appealable order.").

the requests for transfer. The father makes similar arguments. The federal ICWA addressed criteria for ruling on transfer applications:

> Upon receipt of a transfer petition from an Indian child's parent, Indian custodian, or Tribe, the State court must transfer the child-custody proceeding unless the court determines that transfer is not appropriate because one or more of the following criteria are met:
> (a) Either parent objects to such transfer;
> (b) The Tribal court declines the transfer; or
> (c) *Good cause* exists for denying the transfer.

25 C.F.R. § 23.117 (emphasis added). The legislative history of the federal ICWA states that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. *Chester Cnty. Dep't of Social Servs. v. Coleman*, 372 S.E.2d 912, 914 (S.C. Ct. App. 1988) (citing H.R. Rep. No. 95-1386, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7544). The Bureau of Indian Affairs guidelines published in 2016 further clarify the relevant provisions in ICWA and the Final Rule by stating that "Congress intended for the transfer requirement and its exceptions to permit State courts to exercise case-by-case discretion regarding the 'good cause' finding," similar to "a modified (*i.e.,* limited, narrow) version of the *forum non conveniens* analysis." Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778, 38821, 38825 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23). We look to the process under Iowa law as well.

Under Iowa Code section 232B.5

> 10. Unless either of an Indian child's parents objects, in any child custody proceeding involving an Indian child who is not domiciled or residing within the jurisdiction of the Indian child's tribe, the court shall transfer the proceeding to the jurisdiction of the Indian child's tribe, upon the petition of any of the following persons:
> a. Either of the child's parents.
> b. The child's Indian custodian.

> c. The child's tribe.
>
> . . . .
>
> 13. If a petition to transfer proceedings as described in subsection 10 is filed, the court shall find good cause to deny the petition only if one or more of the following circumstances are shown to exist:
>
> a. The tribal court of the child's tribe declines the transfer of jurisdiction.
>
> b. The tribal court does not have subject matter jurisdiction under the laws of the tribe or federal law.
>
> c. Circumstances exist in which the evidence necessary to decide the case cannot be presented in the tribal court without undue hardship to the parties or the witnesses, and the tribal court is unable to mitigate the hardship by making arrangements to receive and consider the evidence or testimony by use of remote communication, by hearing the evidence or testimony at a location convenient to the parties or witnesses, or by use of other means permitted in the tribal court's rules of evidence or discovery.
>
> d. An objection to the transfer is entered in accordance with subsection 10.

Iowa Code § 232B.5(10), (13). While the statute is silent as to the right of a child at issue to object to the transfer, we ruled more than a decade ago that "[t]he children are entitled to a voice at every stage of the proceedings," and, therefore, the statute as written is unconstitutional because it violates the procedural due process rights of the children. *J.L.*, 779 N.W.2d at 489. "After our holding in *J.L.*, if the children object to the transfer of jurisdiction to the tribe, as was done by the GAL in this case, the court must determine whether good cause, including the children's best interests, exists to deny the petition to transfer." *E.D.*, 2016 WL 4379382, at *6. Under ICWA, the "best interests of the child" are defined as

> the use of practices in accordance with the federal Indian Child Welfare Act, this chapter, and other applicable law, that are designed to prevent the Indian child's voluntary or involuntary out-of-home placement, and whenever such placement is necessary or ordered, placing the child, to the greatest extent possible, in a foster home, adoptive placement, or other type of custodial placement that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political,

cultural, and social relationship with the Indian child's tribe and tribal community.

Iowa Code § 232B.3(2).

The federal ICWA statute provides instruction on "how . . . a determination of 'good cause' to deny transfer" is to be made, but Iowa's ICWA statute does not have a corresponding section. *See* 25 C.F.R. § 23.118(c) (providing five things the court "must not consider" in determining whether good cause exists to deny transfer of jurisdiction).[9] And our cases involving "Indian children" are governed by the Iowa statute. *Cf. In re N.V.*, 744 N.W.2d 634, 637 (Iowa 2008) ("Prior to the enactment of the Iowa ICWA [in 2003], the federal Indian Child Welfare Act (federal ICWA) governed cases involving Indian children."). So our court is not limited by these federal ICWA considerations, as the court must determine whether good cause, including the children's best interest, exist to deny the motions to transfer.

The dissent agrees with the tribe and father that impermissible factors were considered by the juvenile court. But, the juvenile court analysis was not so simple. In addressing the best interests of the child under Iowa Code section 232B.3(2),

---

[9] Section 25 C.F.R. § 23.118(c) provides:

> In determining whether good cause exists, the court must not consider:
> 1. Whether the foster-care or termination-of-parental-rights proceeding is at an advanced stage if the Indian child's parent, Indian custodian, or Tribe did not receive notice of the child-custody proceeding until an advanced stage;
> 2. Whether there have been prior proceedings involving the child for which no petition to transfer was filed;
> 3. Whether transfer could affect the placement of the child;
> 4. The Indian child's cultural connections with the Tribe or its reservation; or
> 5. Socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems.

the juvenile court found that the foster parent placement was best able to assist the children with the cultural relationship with the tribe. Those foster parents actively sought education involving the tribe such that the oldest child could count in her native language. When they sought information from the tribe to aid in the effort, no response came. The tribe had no relationship with the children during the pendency of the proceedings and offered no support outside of the efforts of the Iowa professionals and the Iowa foster family. Thus, the current placement has been most involved in the factors related to the best interests of the children in "establishing, developing, and maintaining a political, cultural, and social relationship with the . . . tribe and tribal community." Iowa Code § 232B.3(2).

When considering whether there is good cause for the objection to transfer jurisdiction, the juvenile court did address the late request. Here, in denying the father's and the tribe's motions to transfer jurisdiction, the court articulated how late in the process the motions came—only after the permanency goal was changed to termination and more than a year after the tribe intervened in the proceedings. We recognize that in *N.V.*, our supreme court concluded there was no "time limit on a parent's request to transfer a case to tribal court" and affirmed the juvenile court's decision to grant the "eleventh hour" request. 744 N.W.2d at 636–39. While we understand this ruling to mean the motioning tribe or parent should not be denied for filing a "late" motion to transfer, we do not believe it requires the juvenile court to ignore how much time has passed and what impact that may have on the children when its considering the best interests of the children who objected and if good cause exists to deny the transfer. After all, our "paramount interest" remains protection of the children's best interests. *See D.S.,*

806 N.W.2d at 465. We address a good-cause standard that supports our conclusion that "nothing in [the Iowa ICWA] places maintaining the Indian culture above a child's rights or safety." *J.L.*, 779 N.W.2d at 492 (holding the "narrow definition of good cause prohibiting the children from objecting to the motion to transfer based upon their best interests and introducing evidence of their best interests" violated the children's substantive due process rights).

In denying the motions to transfer, the court determined it was not in the children's best interests because, during the nineteen months the juvenile court had jurisdiction, the oldest child had repeatedly suffered trauma because of the father's actions. Thus, the court recognized her need for permanency. Additionally, the older child—who had lived in several homes with several placements—struggled when new people were introduced into her life, and the court believed bringing new professionals in at that stage of proceedings was unnecessarily harmful. At the time of the hearing on the motions to transfer, nineteen months into juvenile court involvement, the mother was committed under a mental-health and substance-abuse hold and the father was in prison. The tribe made clear it does not believe in terminating the rights of parents and would not do so if the cases were transferred to tribal court. And the mother testified she supported transfer because "you guys are going towards termination." Additionally, the court relied upon the testimony of the tribe's QEW, who testified that if the juvenile court terminated the rights of the parents, the children would still retain their right to be enrolled members of the tribe.

The juvenile court also recognized that the Iowa court was best situated to litigate the custody and parental rights of the parents. We extend that reasoning

to recognize that "[g]ood cause to deny transfer of the proceedings to the tribal court may arise from geographical obstacles." *In re J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984). In *J.R.H.*, the Iowa Supreme Court considered the denial of a motion filed by the Oglala Sioux Tribe in South Dakota to transfer child protection proceedings initiated in Iowa. *Id.* at 314, 317. There, the court denied the transfer on the ground that "[t]he bulk of the evidence and the majority of the witnesses will come from Iowa." *Id.* at 317. With these considerations in mind, the juvenile court's finding follows the underlying legislative premise that the federal ICWA supports flexibility of the states and affords the state court discretion. We support those goals when the best interests of children are the focus, along with preserving the Indian heritage.

Because the court conducted the proper analysis and we do not disagree with its best-interest determination, we cannot say the juvenile court erred in denying the requests to transfer jurisdiction of the child-welfare cases to tribal court.

### C. Whether the State Made Active Efforts

Both the father and the tribe challenge the court's ruling the State fulfilled the "active efforts" mandate. When the State seeks to terminate parental rights "over an Indian child [it] shall provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Iowa Code § 232B.5(19). "The court shall not order the . . . termination, unless the evidence of active efforts shows there has been a vigorous

and concerted level of casework beyond the level that typically constitutes reasonable efforts . . . ." *Id.*

> Active efforts shall include but are not limited to all of the following:
> a. A request to the Indian child's tribe to convene traditional and customary support and resolution actions or services.
> b. Identification and participation of tribally designated representatives at the earliest point.
> c. Consultation with extended family members to identify family structure and family support services that may be provided by extended family members.
> d. Frequent visitation in the Indian child's home and the homes of the child's extended family members.
> e. Exhaustion of all tribally appropriate family preservation alternatives.
> f. Identification and provision of information to the child's family concerning community resources that may be able to offer housing, financial, and transportation assistance and actively assisting the family in accessing the community resources.

*Id.*

At trial, the parents asked several questions about what steps DHS took before removing the older child from the parents' care in November 2018 and the younger child in February 2019. And the father raises this issue more fully on appeal. But insofar as this implicates the part of Iowa Code section 232B.5(19) that requires proof of active efforts "from a party seeking an involuntary foster care placement," this challenge came much too late. Perhaps more importantly, the parents consented to the removal of the children from their care. We do not have the transcript from the June 2019 review hearing when the court considered whether to remove the children from their Native American family member and place them in foster care, but the parents never challenged that modification of disposition as improper. *See In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997)

(rejecting parents' argument when they failed to appeal the order that contained the ruling they now challenged). The father cannot do so now.

Similarly, the father and tribe claim DHS failed to make active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the family. Additionally, the father points out that he went more than eleven months without a visit with his children during his incarceration. Presumably "active efforts" are owed to an incarcerated parent just as "reasonable efforts" are. *See, e.g.*, *In re L.M.*, 904 N.W.2d 835, 839–40 (2017); *see also In re S.J.*, 620 N.W.2d 522, 525 (Iowa 2000) ("The services required to be supplied to an incarcerated parent, as with any other parent, are only those that are reasonable under the circumstances."). But, also like "reasonable efforts," we do not believe a party can wait until the termination hearing to challenge whether active efforts have been made. *See D.S.*, 806 N.W.2d at 466 (assuming the issue of active efforts had been preserved). Objections must be made earlier in the proceedings "so appropriate changes can be made" if necessary. *L.M.*, 904 N.W.2d at 840. Here, the father and the tribe participated throughout the proceedings, and the juvenile court consistently found active efforts were made. These findings were not challenged, and neither the tribe nor the father ever moved for or requested different services in writing. Additionally, the evidence at both the hearings on the motion to transfer and the termination petition established that DHS tried to reach out to the tribe for more information about cultural practices and events the children could participate in, and for possible family or tribe member placement options. The tribe did not respond to the former and was unable to provide more options for the latter. While the tribe faults DHS for spending some time attempting to

reach it through an early attorney who had withdrawn from proceedings, the tribe was a party throughout and was not unaware of what was happening in the children's placements and in their cases generally.

We decline to consider further whether active efforts were made.

### D. Is Termination Proper under ICWA Standards?

Next, both the father and tribe challenge whether there was evidence to support a conclusion beyond a reasonable doubt that continued parental custody of the children would result in serious emotional or physical damage to the children.[10]  *See* Iowa Code § 232B.6(6)(a).  This evidence "must include the testimony of a [QEW] as defined in section 232B.10."  *D.S.*, 806 N.W.2d at 465. And while the court must consider the testimony of the QEW in reaching its conclusion, the statute "does not mandate that the [QEW] testify in support of termination, or in support of the ground that custody by the parent is likely to result in serious emotional or physical harm to the child."  *Id.* at 470–71.  "Rather, this section instructs that, after being fully informed by a [QEW], the court is to consider if the tribe's culture, customs, or laws would support termination on that ground." *Id.* at 471.

Here, Dr. Rudi Mitchell—the QEW who testified at the termination hearing— testified both to his personal views as a member of the Omaha Tribe and his understanding of the tribe's views; he stated neither he nor the tribe support

---

[10] The tribe maintains the court used the wrong standard in its termination order. But "the clear-and-convincing-evidence standard [applies] to all matters except the question of whether [the father's] continuing custody 'is likely to result in serious emotional or physical damage' to [the child].'"  *In re C.A.V.*, 787 N.W.2d 96, 100 (Iowa Ct. App. 2010) (quoting Iowa Code § 232B.6(6)(a)).

termination of parental rights as a legal practice. However, in regard to the family at issue, he also testified he knew "for the circumstances right now, it's not, you know, feasible" to return the children to their parents. He advocated that a Native American family member should take custody of the children and then, "[i]f not blood family members, the tribe exploration should be made to other tribal members because we are all related." Dr. Mitchell explained that "in our tribe, no one is considered a stranger." But Dr. Mitchell could not speak to the efforts already made by DHS and the tribe to find a Native family other than the placements that were unable to maintain the children. Additionally, Dr. Mitchell spoke about success he had seen with Native American parents who obtain services through centers specifically meant for Native Americans, such as a substance-abuse center with Native American counselors that was located in Nebraska. Dr. Mitchell did not list any like services that he believed would have been available to the parents in Iowa. When specifically asked if he believed continued parental custody of the children would result in serious emotional or physical damage to the children, Dr. Mitchell stopped short of agreeing, but he testified, "Well, you know, right now, it just doesn't sound good as far as, you know, the documentation that I read with the parents not being compliant or the problems . . . they're facing with drugs and alcohol." As for the children, he testified, "[A]ny child needs to be in a safe environment. They need to be nurtured and loved and protected." He agreed the children's safety was important to the tribe, testifying, "Like I said, you know, we value children. They're sacred to us, . . . as far as nurturing them, making sure they grow up in a safe environment." He also agreed that the children's safety includes "safety from parents' unresolved

issues with substance abuse" and "safety from the parents' unresolved domestic violence issues."

Dr. Mitchell's testimony, when considered in conjunction with the father's unresolved issues with domestic violence; his declaration he cannot be kept from the mother; and his untreated issues involving methamphetamine, marijuana, and alcohol, prove beyond a reasonable doubt that the father's continued custody of the children would result in serious emotional or physical damage to them.

**E. Qualified Expert Witness.**

In regards to the QEW, the tribe maintains the court erred in relying on only one QEW and wrongly relied upon the QEW's testimony "outside the scope of the of ICWA's" requirements.

Iowa Code section 232B.6(6)(a) states:

> Termination of parental rights over an Indian child shall not be ordered in the absence of a determination, supported by evidence beyond a reasonable doubt, including the testimony of qualified expert *witnesses*, that the continued custody of the child by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

(Emphasis added.) Relying on this section, the tribe maintains the court needed at least two QEWs in order to terminate parental rights.

We recognize the plural form of the word "witness" is used in the statute, but "[u]nless otherwise specifically provided by law the singular includes the plural, and the plural includes the singular." Iowa Code § 4.1(17). And in *In re D.B.Q.*, No. 04-1162, 2004 WL 2168636, at *3 (Iowa Ct. App. Sept. 29, 2004), this court concluded "there is no requirement in the statute that the State present the

testimony of more than one [QEW]." The court did not err in terminating parental rights after hearing testimony from only one QEW.[11]

Finally, the tribe maintains the court wrongly used the QEW testimony outside the scope ICWA contemplates. Citing to section 232B.10(2), the tribe argues the QEW's testimony "should only include two issues: one, the cultural practices and family relationship of the tribe the children are eligible for or are enrolled in, and two, discuss whether [termination] would result in serious emotional or physical damage to the child." Section 232B.10(2)

> *require[s]* that qualified expert witnesses with specific knowledge of the child's Indian tribe testify regarding that tribe's family organization and child-rearing practices, and regarding whether the tribe's culture, customs, and laws would support the placement of the child in foster care or the termination of parental rights on the grounds that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

(Emphasis added.) But the statute does not limit the testimony of the QEW to those matters. And this court has recognized QEW testimony on other topics. In *D.S.*, we recognized that, based on the QEW's testimony, "the juvenile court could conclude the parents had not overcome their issues, their substance abuse issues were going to require long-term rehabilitation, active efforts had been provided to-date, and the [QEW] was not likely to ever support termination due to the tribe's laws and customs." 806 N.W.2d at 472. The juvenile court was not wrong to consider the QEW's testimony in its entirety.

---

[11] In its termination order, the juvenile court noted that it also received an affidavit from Mosiah Harlan in the child-in-need-of-assistance proceedings; Harlan is a QEW for the tribe.

**IV. Conclusion.**

Based on recent case law, we accept the father's delayed appeal. After considering the merits, we affirm the juvenile court's decision to deny transfer of jurisdiction to the tribe and the termination of the father's parental rights.

**AFFIRMED ON BOTH APPEALS.**

Schumacher, J., concurs; Vaitheswaran, P.J., dissents.

**VAITHESWARAN, Presiding Judge** (dissenting).

I respectfully dissent. The purpose of the Iowa ICWA "is to clarify state policies and procedures regarding implementation of the federal Indian Child Welfare Act." Iowa Code § 232B.2. "Best interest of the child" is defined by statute as:

> [T]he use of practices in accordance with the federal Indian Child Welfare Act, this chapter, and other applicable law, that are designed to prevent the Indian child's voluntary or involuntary out-of-home placement, and whenever such placement is necessary or ordered, placing the child, to the greatest extent possible, in a foster home, adoptive placement, or other type of custodial placement that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the Indian child's tribe and tribal community.

*Id.* § 232B.3(2). The statute requires us to consider federal law in analyzing whether transfer to tribal court is in the best interests of a child.

The federal regulation cited in footnote nine of the majority opinion is titled "How is a determination of 'good cause' to deny transfer made?" *See* 25 C.F.R. § 23.118(c). The regulation precludes consideration of "whether the . . . termination-of-parental-rights proceeding is at an advanced stage; "whether transfer could affect the placement of the child"; "[t]he Indian child's cultural connections with the Tribe or its reservation"; and "any negative perception of Tribal or [Bureau of Indian Affairs] social services." *Id.*

The district court considered these factors. The court referenced the "advanced stage" of the proceedings and cited the foster parents' efforts to acculturate the children to their heritage, which implicated their current placement and their cultural connections; and discussed the "excellent supportive services"

provided by the department of human services and service providers, suggesting by negative implication that the services the tribe would provide were not at that level. I would conclude the court's denial of the tribe's transfer motion on these grounds ran afoul of Iowa's Indian Child Welfare Act.

*In re E.D.*, No. 16-0829, 2016 WL 4379382 (Iowa Ct. App. Aug. 17, 2016), does not alter my conclusion. There, the juvenile court transferred an initial child-in-need-of-assistance action to the Omaha tribe. *E.D.*, 2016 WL 4379382, at *1. Following transfer, the tribe removed the children "based on a child protective assessment showing the mother and father both used methamphetamine while caring for the children." *Id.* The tribe returned the children to the mother after she completed treatment. *Id.* The tribal case was dismissed. Later, the State filed a new child-in-need-of-assistance petition. *Id.* at *2. This time, the juvenile court denied the tribe's transfer motion. The court of appeals affirmed the ruling, citing "the particular struggles of this family and the new CINA adjudication after the tribe's earlier dismissal of the child welfare case." *Id.* at *6*.

Here, the Omaha tribe was not afforded an opportunity to assume jurisdiction over the case at any stage, notwithstanding its early intervention in the state-court proceedings. Specifically, the tribe was notified of the child-in-need-of-assistance proceeding on January 2, 2019 and moved to intervene less than two weeks later, well before the child's removal and two years before a termination order was filed. The tribe's ICWA Supervisor and qualified expert witness filed an affidavit attesting to his qualifications and the tribe's cultural beliefs with respect to termination of parental rights and testified at the termination hearing. Although he stated the tribe did not believe in termination of parental rights, he also stated the

tribe would review the current placement of the children and "may possibly leave them with their current placement . . . if they're willing to work with us." He also testified the tribe "would continue with services as much as we can." He affirmed that the safety, health, and welfare of the children was the tribe's paramount consideration.

Because the reasons for denial of transfer contravene the cited federal regulation and Iowa's statutory best-interest definition and because the tribe intervened and provided expert testimony on the tribe's intent to ensure the children's safety, I would reverse the district court's denial of the tribe's motion to transfer jurisdiction.