# IN THE COURT OF APPEALS OF IOWA

No. 24-0877
Filed July 24, 2024

**IN THE INTEREST OF D.D., M.D., and J.D.,**
**Minor Children,**

**K.B., Mother,**
     Appellant,

**D.D., Father,**
     Appellant,

**D.D., Minor Child,**
     Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

A father, mother, and their teenaged son separately appeal a juvenile court order terminating parental rights. **AFFIRMED.**

Mark A. Milder of Mark Milder Law Firm, Denver, for appellant mother.

Joseph G. Martin, Cedar Falls, for appellant father.

Michelle Jungers of Jungers Law PLLC, Waterloo, for appellant minor child D.D.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Nina Forcier of Forcier Law Office P.L.L.C., Waterloo, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**TABOR, Presiding Judge.**

Kimberly and Daniel have struggled with substance use, unresolved mental-health issues, and domestic violence. Those struggles have diminished their parenting skills. As the guardian ad litem noted, the parents had "one year, five months, and ten days" to become safe caretakers for their three children. Because they failed to do so, the juvenile court terminated their parental rights. Kimberly and Daniel separately appeal the termination order, as does their oldest child, D.D. After a careful review of the record, we reach the same conclusions as the district court and affirm its ruling.[1]

## I.      Facts and Prior Proceedings

This appeal involves three children: D.D. (born in 2008), M.D. (born in 2014), and J.D. (born in 2017). Their family came to the attention of the Iowa Department of Health and Human Services in August 2022 when the parents failed to properly supervise the children. Kimberly—who was having mental-health problems—was charged with child endangerment after her two younger children were found "outside unsupervised in the street." Daniel reported that he and Kimberly both used methamphetamine while the children were in the home. The department left the children in the home under a safety plan.

But removal came two months later when Daniel slapped Kimberly in the Wal-Mart parking lot in front of the children. All three children reported ongoing violence in their home. And sometimes they were "entangled in it." For example,

---

[1] We review termination-of-parental-rights proceedings de novo. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). In doing so, we assess both the facts and the law, and we adjudicate rights anew. *Id.* As always, we place a premium on the children's best interests. *Id.*

M.D. told social workers that she once tried to hit her father with a pan to shield her mother. D.D. recalled locking his younger sisters in the bathroom to keep them safe when fights broke out between their parents. The court adjudicated D.D., M.D., and J.D. as children in need of assistance (CINA) in November 2022.

These events in 2022 were not the family's first involvement with the department. In 2013, a child protective assessment determined that Daniel threatened to kill himself and D.D. while the child was in his care. Then in 2014, M.D. tested positive for THC at birth, and Kimberly admitted using marijuana during her pregnancy.

The mother's drug use continued into this case. As the termination order observed: "[Kimberly] has participated in both outpatient and inpatient residential treatment but has not been able to remain sober for any length of time." Her participation in drug testing was sporadic; she missed more than half of the offered test dates. On top of her drug use, the record showed the mother had unmet mental-health needs. She was hospitalized for psychiatric treatment several times. Kimberly did experience some success in addressing her substance use and mental health from July through October 2023 when she was participating in Family Treatment Court. It was during that stint that the court deferred permanency for the children. But she stopped that participation in December 2023. And Kimberly tested positive for methamphetamine when she admitted into a residential facility when her probation was revoked in April 2024.

Beyond her drug use and shaky mental health, Kimberly did not show good parenting skills during the supervised visits with her children. The department's

social work case manager recalled: "[I[t was very apparent she's unengaged, would stare out the window, talk to herself."

The father grappled with the same issues as the mother. He had a history of methamphetamine use and missed forty of forty-five chances to drug test during the CINA case. Daniel defied the department's request for an updated substance-use evaluation and did not seek residential treatment despite professing that he planned to do so. He also had unaddressed mental-health issues. What's more, he committed domestic abuse, including the assault conviction with Kimberly as the victim. Because of his anger issues, "the girls are very scared of him," according to the department's case manager. As for their visits, Daniel was inconsistent in attending. And when he did attend he repeatedly violated the department's supervision requirements—in one instance "screaming" at the social worker and driving off with D.D. in his car, requiring police to intervene.

Not surprisingly, the children suffered as a result of all this chaos in their lives. Fifteen-year-old D.D. exhibited unruly behavior, including skipping school, running away, shoplifting, vandalism, and fighting. He was placed in a Qualified Residential Treatment Program (QRTP). Nine-year-old M.D. was in a psychiatric hospital at the time of the trial. She was hurting herself, destroying property, and screaming for hours on end. Six-year-old J.D. would mimic her sister's behavior by throwing tantrums. But at the time of trial, her behavior was improving in her foster home.

Noting the parents' lack of progress and the children's need for stability, the State petitioned for termination of parental rights in March 2024. As grounds, the petition cited Iowa Code section 232.116(1) (2024), paragraphs (e), (f), and (*l*). At

the April 2024 termination trial, the department's social work case manager was the only witness. Daniel did not appear; his counsel believed that his client was at an inpatient treatment facility, but had no verification. Kimberly also failed to appear in person, but did participate by telephone for part of the trial. D.D. attended the trial with his lawyer, but did not testify. His lawyer expressed D.D.'s opposition to termination. The district court terminated the rights of both parents on the grounds alleged by the State. Kimberly, Daniel, and D.D. all filed petitions on appeal challenging the termination order.

## II. Discussion

Courts follow a three-step analysis in termination cases. *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). First, we must decide whether the State proved one of the enumerated grounds in section 232.116(1) by clear and convincing evidence. *Id.* Second, we must decide whether termination is in the best interests of the children under the framework of section 232.116(2). *Id.* Third, if the factors require termination, we must see if any circumstances in section 232.116(3) weigh against termination. *Id.* "The factors weighing against termination in section 232.116(3) are permissive, not mandatory." *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011). Courts may exercise their discretion in deciding whether to apply the factors in section 232.116(3) to save the parent-child relationship based on the unique circumstances of each case and the best interests of the children. *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

**A. The Father's Appeal**

**1. Grounds for Termination**

Daniel concedes the sufficiency of the State's evidence under paragraphs (f) and (*l*) of Iowa Code section 232.116(1). We thus affirm those grounds for termination. But he contends the district court erred in determining that termination of parental rights was in the children's best interests "in lieu of deferring permanency or granting alternative permanency options."

**2. Best Interests**

The father's petition on appeal does not cite section 232.116(2).[2] Yet he argues that termination is not in the children's best interests because the department had not lined up homes where they would be adopted. He notes: "D.D. had not yet completed his QRTP programming, and it will likely be extremely difficult to find a concurrent adoptive placement considering his age and behaviors."[3] He adds: "M.D.'s future is equally uncertain. At the time of trial PMIC [psychiatric medical institute for children] placement was recommended but had not yet been identified, creating uncertainty about when and under what circumstances she might be a candidate for an adoptive home."

---

[2]In considering the best-interests framework under section 232.116(2), we give primary consideration to the children's safety, the best placement for furthering their long-term nurturing and growth, and the children's physical, mental, and emotional condition and needs. *See In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). We also consider a child's integration into their foster family. *See* Iowa Code § 232.116(2)(b).

[3] There is some irony in Daniel's argument that it will be difficult to find a placement for D.D. after he leaves the QRTP. The record shows that Daniel's disruptive conduct prompted D.D.'s foster family to reconsider their willingness to serve as a long-term placement.

On the issue of concurrent placements, the record shows that J.D.'s foster family is willing to adopt. She has been thriving in their care, accessing activities such as music therapy and sports. And even without an identified concurrent placement for M.D. and D.D., termination of Daniel's parental rights will enable them to move toward a permanent placement after they have time to heal from the trauma of their violent homelife. We find termination is necessary for the children's safety and their long-term nurturing and growth.

### 3. Factors Weighing Against Termination

Daniel also argues that exceptions under section 232.116(3) weigh against termination of his rights. He invokes paragraphs (b) (child over ten objects) and (c) (closeness of bond) as applicable to D.D. and paragraph (d) (child placed in hospital) as to M.D.

We start with D.D.'s objections to termination and his relationship with his father. *See* Iowa Code § 232.116(3)(b), (c). The district court observed that he was "very loyal to his father even to his detriment." The record supports that observation. The case manager testified that father and son had a strong bond. But she believed that "the more contact [D.D.] has with his father, the more his behaviors get out of control. It's very apparent that his father is encouraging poor behaviors." Like the district court, we credit the case manager's experience with the family.

When analyzing the child-objection factor in section 232.116(3)(b), we have drawn an analogy to custody disputes in divorce cases. *A.R.*, 932 N.W.2d at 592 (noting preferences of minor children cannot be ignored but are not controlling). We consider the child's age and grade level, the strength of their preference; their

intellectual and emotional make-up; their relationship with family members; the reason for their decision; and the advisability of honoring the child's wishes. *Id.* Here, D.D. was in his mid-teens and placed in a group-care setting because of his concerning behaviors. The record shows that much of D.D.'s misconduct can be traced to his father's negative influence. So while we respect D.D. for coming to court and expressing his objection to termination, we do not find that this permissive factor required the juvenile court to bypass termination under these circumstances. *See id.* In this situation, we do not find it advisable to honor D.D.'s wishes. In the same vein, we do not find that Daniel has shown by clear and convincing evidence that termination would harm D.D. because of the closeness of their relationship. If anything, D.D.'s blind allegiance to his father has undermined the child's welfare.

## B. The Child's Appeal

The child's petition on appeal does not contest the grounds for termination. Instead, D.D.'s counsel asserts that termination was not in his best interests under section 232.116(2) and the exceptions under paragraphs (b) and (c) of section 232.116(3) should apply. Counsel contends: "Although permanency is important, terminating D.D.'s parents' parental rights does not achieve permanency for D.D., it simply makes him an orphan, without his natural parents or the prospect of adoptive parents." D.D. also points out that the department had no plan to place him with his siblings.

We deny the child's appeal for the same reasons that we rejected Daniel's challenges. The State offered clear and convincing proof that termination of parental rights was in D.D.'s best interests. As the case manager testified,

termination "would give the kids a chance to start healing and then moving forward, and they can't do that when their parents are still involved." We agree moving forward free of his father's influence is in D.D.'s best interests and the record does not show a strong bond between D.D. and his mother.

On the sibling issue, the case manager explained that the department did not explore placing D.D. with his sisters because he had been staying with the parents of a friend, until his father sabotaged that placement. But she hoped that a future placement would be open to enabling sibling contact. We recognize that "[w]herever possible brothers and sisters should be kept together." *In re L.B.T.,* 318 N.W.2d 200, 202 (Iowa 1982). Unfortunately, here that does not seem possible. But with or without his sisters, preserving the unhealthy tie to his parents will not support D.D.'s long-term nurturing and growth.

### C. The Mother's Appeal

Kimberly concedes the sufficiency of the State's evidence supporting paragraph (f) of section 232.116(1). We thus affirm the termination of her parental rights on that ground.

### 1. Denial of Motion to Continue

But Kimberly does challenge the district court's refusal to continue the termination trial when she was unable to attend the hearing because of her work schedule. We review that ruling for an abuse of discretion. *In re M.D.,* 921 N.W.2d 229, 232 (Iowa 2018). We find abuse only when the ruling is based on reasons that are clearly unreasonable or it reflects an erroneous application of the law. *Id.*

Kimberly points out that at the time of the trial she was residing at a halfway house that had strict requirements for employment. She asserts that she could not

take leave from work to attend the trial. But the record is not that straightforward. The trial was set to start at 9 a.m. By 9:45 a.m. neither parent had appeared. When the court asked Kimberly's counsel why she was not present, he explained:

> I did try to reach out to my client last week on her phone number and then e-mailed her earlier this week with reports for the hearing to try to discuss the hearing. I did not hear back from her, so I'm not sure if her phone is working properly. I just became aware last night that she was actually in the facility based on the exhibits that were filed by the State. So I had this phone hearing this morning, and I then gave a call over to the Waterloo Women's Center when she was not here today to find out the status. She indicated to me that she did not have a ride to get to the hearing today, and that she also indicated she has to be at work at 11:00, and that's about as far as I was able to discuss with her before I walked into the courtroom, because I knew the Court was likely on the bench and prepared to move forward on this matter.

The court addressed Kimberly on the phone, asking why she could not walk the two blocks from the facility. Kimberly explained that she would then need a ride to work by 11 a.m. The court then told her that she was welcome to stay on the phone but declined to continue the hearing.

"The focus of child welfare in this country, and Iowa, is now on permanency, and continuances of court hearings to accommodate parents might offend this goal." *Id.* at 233. The record shows that Kimberly was aware of the trial date and could have sought accommodations to attend but did not do so. We find no abuse of discretion in the court's decision to move forward with the trial.

### 2. Best interests

Kimberly next argues that termination of her parental rights was not in the children's best interests. But she does not address the best-interests framework in section 232.116(2). Instead, she harkens back to her counsel's recommendations to the district court at the close of the termination trial:

So I guess what I would be asking on behalf of my client with regard to [D.D.] and [M.D.] is that the Court enter a permanency order for custody to be placed with the Department of Health and Human Services for purposes of their long-term care programs and review that as necessary at least every year to see where they're at in those long-term programs and then assess their further permanency options at that point when they're actually able to benefit from a permanency order. And perhaps one of the parents would be in a situation at that point where they could be a placement option.

Kimberly's counsel had a different recommendation for the youngest child:

As far as [J.D.], what I would request on behalf of my client is that the Court would enter a guardianship with the current placement, and then that would, again, have regular reviews. And if the parents were able to substantially change their circumstances, we'd possibly be able to modify that at some point. But that would be, I think, the best that I can ask for as far as on behalf of my client.

Kimberly recognizes in her petition on appeal that the "available options" were limited because of the previous deferral of permanency and her circumstances at the time of the trial. But she contends that her proposals, while not a long-term solution, would have prevented the three children from "becoming orphans and wards of the state."

Like the district court, we find termination of the mother's parental rights was in the children's best interests. The court aptly observed that "the uncertainty and trauma they have lived with because of their parents have impacted each of them negatively." Kimberly's lack of progress in addressing her substance use, mental health, and parenting deficiencies make waiting for reunification an unworkable option. Moving toward permanency will be the best option for the children.

**AFFIRMED.**